T.C. Memo. 2020-119

UNITED STATES TAX COURT

ALKA SHAM, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10531-17.                    Filed August 12, 2020.

In 2010 P was unemployed after leaving work in the investment management field and experienced medical problems requiring treatment. In 2011 P became an independent business consultant in the medical industry. From 2011 through part of 2015, P was retained by an anesthesiologist to expand his practice and perform basic business management. P did not accurately report or maintain records of her gross receipts.

P filed late her income tax returns for the years 2010 through 2015. On those returns P claimed significant medical expense deductions and other miscellaneous deductions on Schedules A, "Itemized Deductions", of her returns, some of which she could not substantiate. P also claimed business deductions on Schedules C, "Profit or Loss From Business", of her returns for tax years 2011 through 2015 that she could not substantiate. P did not report a refund of State tax on her return for 2014.

[*2]    By a statutory notice of deficiency ("SNOD") issued in 2017, R determined that P did not report all of her income and that some of her claimed deductions should be disallowed. R also determined that P is liable for accuracy-related penalties for the years 2010 through 2013 and additions to tax for the years 2013 through 2015.

    Held: P failed to include certain amounts in gross income that should have been reported on her tax returns.

    Held, further, with few exceptions, P failed to substantiate her entitlement to deductions for medical expenses and business expenses beyond those R already allowed in the SNOD or conceded at or after trial.

    Held, further, P is liable for accuracy-related penalties for the years 2010 through 2013 and additions to tax for the years 2013 through 2015.


Alka Sham, for herself.

Christopher D. Davis, for respondent.


CONTENTS

I.    FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    B.    Unemployment in 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.    Self-employment in 2011-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    Apartment 16A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    E.    Dr. Kukreja's finances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    F.    Self-employment income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    G.    Self-employment expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**[\*3]**     1.     The claimed expense deductions generally. . . . . . . . . . . . . 14
              2.     Travel expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                     a.     Car and truck expenses . . . . . . . . . . . . . . . . . . . . . . . 16
                     b.     Local transportation  . . . . . . . . . . . . . . . . . . . . . . . . . 17
                     c.     Travel for medical conferences. . . . . . . . . . . . . . . . . 17
                     d.     Other travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

              3.     Meals and entertainment . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              4.     Expenses paid by Dr. Kukreja. . . . . . . . . . . . . . . . . . . . . . 20
              5.     Reimbursed expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       H.     Medical expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

              1.     Deductible expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
              2.     Reimbursements from health insurance . . . . . . . . . . . . . . 26

                     a.     2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
                     b.     2011-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
                     c.     2014-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

       I.     State income tax refund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
       J.     Taxable interest and dividends . . . . . . . . . . . . . . . . . . . . . . . . . 30
       K.     Charitable contributions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
       L.     Tax returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
       M.     Examination and SNOD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

II.    OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

       A.     Applicable legal principles  . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

              1.     Burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
              2.     Record-keeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

       B.     Income issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

              1.     Schedule C income for 2014 . . . . . . . . . . . . . . . . . . . . . . 42

**[\*4]** 2. State tax refund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    3. Interest and dividends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    4. Capital gain/loss for 2014 and 2015 . . . . . . . . . . . . . . . . . . . . 47

 C. 2010 Schedule A miscellaneous expenses . . . . . . . . . . . . . . . . . . . . 48
 D. Schedule A itemized deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    1. Medical expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      a. Medical expenses generally . . . . . . . . . . . . . . . . . . . . . . 50
      b. Self-employed health insurance expense . . . . . . . . . . 51
      c. Unreimbursed itemized deductible medical expenses . 52
      d. Summary of deductible medical expenses . . . . . . . . . . 54

    2. Charitable contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

 E. Schedule C expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    1. Rent/lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    2. Depreciation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    3. Office expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    4. Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    5. Car/truck . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    6. Travel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    7. Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      a. "Local transport". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
      b. "Dues and subscriptions" . . . . . . . . . . . . . . . . . . . . . . . 65
      c. "IT and technology" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
      d. "Telephone and internet" . . . . . . . . . . . . . . . . . . . . . . . 66
      e. "Business research and establishment". . . . . . . . . . . . 67
      f. "Professional development", "conferences", and
        "continuing education" . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      g. "Meals and entertainment" . . . . . . . . . . . . . . . . . . . . . . 69
      h. "Outside/professional services" . . . . . . . . . . . . . . . . . . 70
      i. "Promotion" and "gifts" . . . . . . . . . . . . . . . . . . . . . . . . 71

**[\*5]** F.    Penalties and additions to tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

       1.    Additions to tax under section 6651(a)(1) and (2) . . . . . . . . . 71
       2.    Addition to tax under section 6654. . . . . . . . . . . . . . . . . . . . . 76
       3.    Accuracy-related penalty. . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Appendix A:  Income items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Appendix B:  Deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>: The Internal Revenue Service ("IRS") issued to petitioner, Alka Sham, a statutory notice of deficiency ("SNOD") pursuant to section 6212[1] on February 17, 2017, determining deficiencies in Ms. Sham's Federal income tax (plus penalties and additions to tax) for the years 2010 through 2015, as follows:

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.) in effect at all relevant times, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

**[*6]**

|  | | Penalty | Additions to tax | | |
| Year | Deficiency | Sec. 6662 | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 2010 | $14,804 | $2,961 | --- | --- | --- |
| 2011 | 17,716 | 3,543 | --- | --- | --- |
| 2012 | 18,749 | 3,750 | --- | --- | --- |
| 2013 | 21,520 | 4,304 | $969 | --- | --- |
| 2014 | 54,979 | --- | 12,370 | ([1]) | [2]$987 |
| 2015 | 21,436 | --- | 4,823 | ([1]) | 386 |

[1]To be determined.
[2]Before trial, the Commissioner conceded the section 6654 addition to tax for 2014.

Ms. Sham filed a timely petition under section 6213(a) for redetermination of the deficiencies, penalties, and additions to tax. After the parties' concessions of various issues, we must decide: the amount of Ms. Sham's income for the year 2014, whether she is entitled to certain deductions she claimed for the years 2010 through 2015, and whether she is liable for the penalties and additions to tax determined by the IRS (with the exception of the section 6654 addition to tax for 2014, which was conceded). We uphold the IRS's adjustments in large part, and we mostly deny the additional deductions that Ms. Sham claims. We uphold the additions to tax and the imposition of the accuracy-related penalties under section 6662.

**[\*7]** On the evidence before us, and employing the burden-of-proof principles set out below, we find the following facts.

## I. FINDINGS OF FACT

A.    Background

Ms. Sham has two master's degrees. She was an investment manager for several years, managing three portfolios.

B.    Unemployment in 2010

In 2009 Ms. Sham had a dispute with her then employer that precipitated a serious illness. Ms. Sham left work for that employer in 2009 and had major surgery in 2010. She had many medical appointments in 2010 and often used a taxi or public transit to travel to and from her appointments. That same year she paid a lawyer $6,100 to negotiate a settlement with her former employer and eventually reached an agreement, pursuant to which she remained at home, unwound positions in the portfolios she managed for her former employer, and collected $136,154 in settlement of a dispute that required her former employer to compensate her "like an executive" during that time. Also in 2010 Ms. Sham paid a different law firm a retainer of $1,250 to represent her in a matter entitled MH Residential I, LLC v. Robert Haney, Alka Sham, which did not pertain to her dispute with her former employer.

**[*8]**    During 2010 Ms. Sham resided at an apartment in New York, New York, in a residential building known as the Manhattan House.

Ms. Sham collected unemployment benefits from the State of New York at a rate of $354 per week from December 2009 through January 2011.  In 2010 those benefits totaled $18,440, which she reported on her 2010 tax return.  We find that Ms. Sham was in fact unemployed for all of 2010.

C.    Self-employment in 2011-15

In 2010 Ms. Sham experienced medical problems that caused her to seek employment in a new field.  Having had significant experience with the health care industry, she began to work as a self-employed business consultant for Dr. Navrajan Kukreja, an anesthesiologist with whom she had a 15-year personal relationship.  Dr. Kukreja did business through three entities--Anesthesiology Consultants, LLC, Perioperative Consultants, LLC, and SMKM Investments, LLC--to which we sometimes refer as Dr. Kukreja's "entities".  Dr. Kukreja's medical business was limited to anesthesiology.

In her work for Dr. Kukreja, Ms. Sham was to negotiate contracts by which the entities would provide anesthesiology services to "ambulatory surgical centers" in New Jersey.  Dr. Kukreja engaged her to expand into the unpenetrated parts of the New Jersey and New York markets, but no business ever materialized

[*9] there.  Ms. Sham also functioned to some extent as a business manager for Dr. Kukreja and his entities.  From 2011 to 2015 Dr. Kukreja (through his entities) was Ms. Sham's only paying client.  Ms. Sham did not identify any prospect with whom she successfully negotiated a contract for Dr. Kukreja's business or any prospects whom she pursued for that purpose (and neither did Dr. Kukreja).

During the time that Ms. Sham worked for Dr. Kukreja and his entities, she worked approximately 20 hours per week, which included time spent speaking with specialists, visiting their facilities, traveling to meetings, chit-chatting, and reading.  She was also an active member of the Financial Women's Association of New York and attended networking events with Young Jewish Professionals, where she engaged with other financial professionals.  Ms. Sham ceased working for Dr. Kukreja in 2015 and, as of the date of trial, remained unemployed.

D.    Apartment 16A

In November 2010 Ms. Sham signed a lease on a new apartment in New York ("Apartment 16A").  She vacated her previous apartment at the Manhattan House and rented and resided in Apartment 16A from 2011 to 2015; during those years she paid rent on no other residence.  (Ms. Sham says that during these years, she lived with friends and rented Apartment 16A only for business purposes, but for reasons we explain below in part II.E.1, we conclude otherwise.)  To an extent

[*10] that we cannot quantify, she sometimes used Apartment 16A for business meetings, though she also conducted business meetings at other locations, such as restaurants. She did not use any portion of Apartment 16A exclusively for business purposes.

Through 2013 Ms. Sham paid rent on her apartment from bank accounts in her name. In 2014 Dr. Kukreja made a direct payment to the rental company of $35,000 toward the rent on Apartment 16A. In 2015 Dr. Kukreja made another direct payment of $15,000 toward the rent on Apartment 16A.

E.    Dr. Kukreja's finances

No financial records of Dr. Kukreja and his entities were offered into evidence, but from the evidence that was offered we conclude that his financial matters were handled in an unorthodox manner, with which Ms. Sham cooperated. Dr. Kukreja used his personal and business bank accounts to pay expenses that were apparently Ms. Sham's (which she reimbursed to an extent we cannot determine); he simultaneously deposited business receipts of the entities (and his own money) into accounts that belonged to Ms. Sham and had her make, from her accounts, payments of his expenses. Before 2014 Ms. Sham was using her personal account ending in -0964 to deposit checks from Dr. Kukreja and also to pay his business and non-business expenses.

**[*11]** In February 2014 at Dr. Kukreja's request, and using a $100,000 deposit from Perioperative Consultants, LLC, Ms. Sham opened in her own name and with herself as the sole signatory a TD Bank checking account ending in -9232 ("TD checking account"). In May 2014, using a $25,000 deposit from the TD checking account, she opened in her own name and with herself as the sole signatory a TD Ameritrade securities trading account ending in -2245 ("TD Ameritrade account"). Records of the TD Ameritrade account show short-term capital losses of $157,600 in 2014 and $353,729 in 2015 resulting from trades in that account. In 2015 Ms. Sham also had a short-term capital loss of $35,542 and a net long-term capital loss of $255 resulting from trading activity in another TD Ameritrade account ending in -4516 and titled solely in her name ("personal Ameritrade account").

Even though Ms. Sham had legal title to these three accounts, Dr. Kukreja had primary control over two of the accounts--the TD checking account and the TD Ameritrade account--and was solely responsible for the activities in those two accounts. Ms. Sham had opened the TD checking account, left Dr. Kukreja with a book of blank checks that she had signed, and then left the country to travel to India. Ms. Sham thereafter signed checks at Dr. Kukreja's direction, but she otherwise had insignificant oversight of the activities on the TD checking account and the TD Ameritrade account.

**[*12]**  With the exception of the initial $25,000 deposit Ms. Sham made from the TD checking account to open the TD Ameritrade account, she was not responsible for the activity on either account.  Dr. Kukreja used the TD checking account for his personal use and for the business needs of his entities.  He had obtained the password and online login information and performed the securities trades on the TD Ameritrade account.  Thereafter in 2014 and 2015, checks from the TD checking account were written for the benefit of Dr. Kukreja and his entities.  After trial the Commissioner conceded that only Dr. Kukreja traded with or withdrew proceeds from the TD Ameritrade account.  The transfers to the TD Ameritrade account were all either deposits from the TD checking account or wire transfers initiated by Dr. Kukreja.  The wire transfers by Dr. Kukreja totaled $119,000.

F.    Self-employment income[2]

Ms. Sham's arrangement with Dr. Kukreja apparently called for her to receive compensation as a percentage of the business income she generated, but it does not appear that she was ever paid on that basis or on any other coherent basis. Her compensation came sometimes in the form of checks payable to herself and

---

[2]A summary of all of Ms. Sham's income items for the years at issue is included as Appendix A to this Memorandum Opinion.

[*13] sometimes by checks paid by Dr. Kukreja or one of his entities to cover Ms. Sham's expenses (for example, the $35,000 payment in 2014 and the $15,000 payment in 2015 towards the rental of Apartment 16A).

For 2011-13, the parties have agreed, and we find, that Ms. Sham's gross receipts from self-employment reported on Schedule C, "Profit or Loss From Business", were $6,451 for 2011, $162,283 for 2012, and $98,790 for 2013.[3] On Schedules C accompanying her returns for 2014 and 2015, Ms. Sham reported that her gross receipts from self-employment were $71,451[4] for 2014 and $36,000 for

_____

[3]At trial Ms. Sham showed (on Exhibit 71-P) her computation of these amounts of gross receipts for 2011-13, and the Commissioner accepted them in his post-trial answering brief. The agreed gross receipts are not the same as the amounts that Dr. Kukreja reported for 2014 on untimely Forms 1099-MISC, "Miscellaneous Income"--i.e., $72,355 for 2011, $86,600 for 2012, and $117,300 for 2013--and that Ms. Sham reported on her tax returns. Regardless of whether the compensation had been paid by Dr. Kukreja or any of his entities, all of those amounts were included on the Forms 1099-MISC issued by Anesthesia Consultants. The amounts on the Forms 1099-MISC did not include any amounts that Dr. Kukreja paid "again[s]t [Ms. Sham's] income" in any given year for expenses such as office supplies and car repairs, nor did they include any amounts consisting of reimbursements for expenses Ms. Sham paid on behalf of Dr. Kukreja or his entities. Ms. Sham reported the amounts from the Forms 1099-MISC on the Schedules C-1 attached to her tax returns for those years--which she filed late, as we explain below in part I.L. (It appears that some amounts reported for 2011 may not have actually been paid until 2012; but the Commissioner does not dispute her gross receipts for those years, and we make no adjustment.)

[4]Ms. Sham contends in her post-trial brief that her gross receipts for 2014 should be further reduced to $51,562 by subtracting $20,838, an amount that is the

(continued...)

[*14] 2015.[5]  In his post-trial answering brief, the Commissioner accepts these

amounts, and we find that her gross receipts were as reported.

G.      Self-employment expenses

        1.      The claimed expense deductions generally

In her tax returns for the years 2011, 2012, 2013, 2014, and 2015 (described

below in part I.L), Ms. Sham claimed deductions for expenses on Schedules C for

being in the business of marketing and business development.  For 2011, 2012,

and 2013, Ms. Sham claimed deductions for expenses on two different

Schedules C (without differentiating between the type of business described on

each schedule).  The expenses for which she claimed deductions include, inter

alia, rent, utilities, depreciation, travel, office supplies, local transit, telephone,

---

[4](...continued)
sum of two alleged mortgage payments made for Dr. Kukreja's benefit from
$72,400 (the sum of the amounts she contends were gross receipts).  For the
reasons explained below in part II.B.1, we reject this contention and find that her
Schedule C gross receipts for 2014 are $71,451, as she reported on her 2014
return.

[5]As with 2011-13, these amounts for 2014 and 2015 vary from what
Dr. Kukreja reported on Forms 1099-MISC.  Anesthesia Consultants reported
Ms. Sham's compensation on Forms 1099-MISC that were not filed until 2017.
Those forms reported compensation of $157,336 for 2014 and $72,800 for 2015.
The Commissioner has conceded $85,885 of the $157,336 in Schedule C gross
receipts for the year 2014 and $36,800 of the $72,800 in Schedule C gross receipts
for the year 2015.

[*15] business development, meals and entertainment, professional services, and promotional expenses.

The Commissioner has either conceded or did not disallow many of the Schedule C expense deductions claimed on Ms. Sham's returns. Ms. Sham has attempted to substantiate business expenses even where it appears from the record that such expenses are not at issue, and in those instances we do not allow her any additional deduction.[6]

In general, Ms. Sham has established that she paid for many of the items for which she claims expense deductions (though not always in the amounts she claimed on her returns or in this litigation). However, where she has failed to prove a business purpose for those expenditures, we find that she has not proved a deductible expense.

We discuss the disputed expenses below in parts I.G.2 through I.H and explain which categories or items of business and non-business expenses that Ms. Sham was able to substantiate. In part II we discuss the legal principles that

[6]For 2013 Ms. Sham did substantiate that the amount of her self-employed health insurance was greater than the amount she reported on her return and that the Commissioner did not challenge in the SNOD (and we allow the higher amount). While the availability of this so-called "above-the-line" deduction does depend on her being self-employed, it is not a business expense to be reported on Schedule C.

[*16] we apply in making our holding, and in Appendix B we tally the allowed items.

### 2. Travel expenses

#### a. Car and truck expenses

Ms. Sham reported business car and truck expenses of $9,821 for 2011; $7,372 for 2012; and $7,577 for 2013. She provided invoices related to automobile maintenance and repairs for each of those years of $6,455 for 2011; $5,640 for 2012; and $5,521 for 2013. We find that the amounts on the invoices for automobile maintenance and repairs were expenses paid by Dr. Kukreja, as we explain below in part I.G.4, and we deny those amounts on that basis. Ms. Sham asserts that the remaining amounts of the deduction claimed for each year--$3,366 for 2011; $1,732 for 2012; and $2,056 for 2013--were mileage expenses, but she did not maintain any vehicle mileage logs as a contemporaneous record of her miles driven, the destination reached, or the business purpose of the use of a vehicle during any of the years at issue. We find that she did not substantiate the car and truck expenses. See infra pt. II.E.5.

**[\*17]**      b.      <u>Local transportation</u>

During the years at issue Ms. Sham often traveled by taxi, shuttle service,

and public transportation.  As we explain below in part II.E.7.a, Ms. Sham did not

offer any specific evidence of the claimed business purpose of this transit other

than her own conclusory assertions.  We find that she did not substantiate local

transit expenses beyond what the Commissioner conceded as deductible not

because of the established business purpose of the expenses, but rather as

unreimbursed expenses incurred to facilitate her medical care.  <u>See</u> <u>infra</u> pt. I.H.1.

c.      <u>Travel for medical conferences</u>

During the years at issue, Ms. Sham traveled to Montauk, New York, and

Napa, California, to attend conferences that targeted executives in the medical

industry, for which she paid expenses totaling $5,981 in 2012, $2,000 in 2013,

$12,743 in 2014, and $554 in 2015.[7]  The Commissioner has conceded on brief

---

[7]This business-related travel consisted of:  for 2012, $5,981 for a program on business negotiations, including the program fee, hotel, and flight expense; for 2013, $2,000 for "MPF Coaching" targeted at executives; for 2014, $2,000 for "MPF Coaching", $6,833 for a conference in Napa, California, on healthcare and investing, $770 for a program on negotiations in Montauk, New York; and $3,140 for an additional conference on negotiations for executives in the medical industry (conferences inclusive of meals and travel); and for 2015, $554 for a conference for medical industry professionals (with associated travel and hotel).  On her returns Ms. Sham classified each of these Schedule C expenses as either "Other (Conferences)" or "Other (Professional Development)".

[*18] that Ms. Sham met her burden to establish the business purpose for her attendance at conferences and training specific to executives in the medical industry, and we find that these conferences were related to her self-employment. See infra pt. II.E.7.f.[8]

### d. Other travel

Ms. Sham also paid substantial travel expenses flying to Amritsar, India; Amsterdam, Netherlands; Paris, France; and Charlotte, North Carolina, and these expenses were not related to her self-employment. See infra pts. II.E.6, II.E.7.f. Some of this travel was to attend classes and presentations in the areas of Ericksonian hypnosis, neuro-linguistic programming, boundaries training, and mind-resonance processing ("MRP"). This training focused on the development of "soft skills" and gave general self-help guidance; it did not develop professional skills specific to Ms. Sham's self-employment (and for that reason, in addition to Ms. Sham's failure to meet the heightened substantiation requirements for these

---

[8]As we explain below in part II.E.6, we do not find that Ms. Sham met the heightened substantiation requirements applicable to deduct her travel expenses as a business expenditure. In light of the Commissioner's concession of a portion of these travel expenses deducted for conferences related to professional development (detailed below in part II.E.7.f), we allow those conceded items. But because the Commissioner conceded none of the "other travel"--presumably because, as we find, it was not related to the business of Ms. Sham's self-employment--we disallow those expenses.

[*19] items, we do not allow deductions sought for this training for the proffered reason of "professional development", as we explain below in part II.E.7.f). Dr. Kukreja did not have any business use for the development of skills involving Ericksonian hypnosis, neuro-linguistic programming, or MRP, nor was he seeking to expand his medical practice into these areas. Over the period that Ms. Sham traveled to attend training for Ericksonian hypnosis, neuro-linguistic programming, and MRP, she was also recovering from trauma and, in 2014 and 2015, separating her affairs from those of Dr. Kukreja, who she believed had a negative psychological impact on her.

Other of Ms. Sham's travel in these years included visits with relatives, and we do not find that these trips related substantially to her business or to developing client prospects. Ms. Sham has not established that the remaining travel or other expenditures for training relating to soft skills development have a business purpose, and we find that these were not related to her self-employment.

3. Meals and entertainment

Ms. Sham reported deductible expenses for meals and entertainment of $1,255 for 2014 and $433 for 2015. The parties agree that Ms. Sham paid $1,255 in 2014 (the amount she reported on her return) and $1,000 in 2015 (more than she

[*20] reported on her return) for business-related meals and entertainment.  But see infra pt. II.E.7.g.

    4.    Expenses paid by Dr. Kukreja

With regard to deductions claimed for expenses that were paid by Dr. Kukreja "again[s]t [Ms. Sham's] income" for any given year, we find that Ms. Sham is not entitled to these deductions because she did not incur the expenses associated therewith.  Rather, we find that as a result of the method she employed to calculate her gross receipts, in which the amounts she paid (or repaid) to (or on behalf of) Dr. Kukreja were subtracted from her gross receipts, she was not ever charged with the income that was used to purchase these particular items that she claims were her expenses.

Moreover, the Commissioner does not now argue that Ms. Sham should be charged with gross income in the amount of the expenses Dr. Kukreja paid on her behalf.[9]  The nature of the arrangement in which Dr. Kukreja paid for items Ms. Sham contends were for the use of her business eliminated the possibility of deducting those items; they were either already subtracted from her gross receipts

---

[9]There is one exception:  the rent that Dr. Kukreja paid on Apartment 16A.  However, this is a specifically identified expenditure that both parties agree was gross income to Ms. Sham.  The dispute is whether the amount of rent paid is deductible on Schedule C.

[*21] (by Dr. Kukreja) or, if not so subtracted, had no effect on the calculation of her income in the first instance. These expenses consist of: $6,455 in automobile maintenance and repairs, $5,257 in office furniture, and $2,523 in office repair for 2011; $4,308 in office supplies and hardware, $1,438 in marketing, and $5,640 in automobile repairs for 2012; and $7,630 in office supplies and hardware and $5,521 in auto repairs for 2013. We find that, to the extent the expenses were incurred, they were not expenditures of amounts included in Ms. Sham's gross receipts; we accordingly find that Ms. Sham did not incur these expenses for which deductions were disallowed in the SNOD.[10]

5.    Reimbursed expenses

There are also occasions on which it appears that Dr. Kukreja paid Ms. Sham as purported reimbursements of expenses she had paid. For example, Ms. Sham deposited a $25,000 check from Anesthesia Consultants on March 4, 2013, with the memo line notation "Exp Reimb." With the exception of tax year 2014, her gross receipts have been established by stipulation; and it appears that the payments that Dr. Kukreja made to Ms. Sham and that he characterized as

---

[10]The invoices that Ms. Sham has offered for the expenses paid by Dr. Kukreja contain neither the precise categories of expense described on her returns nor the precise amount of each deduction claimed on the returns. Some of the amounts reflected on the invoices represent claimed deductions that the Commissioner has not disallowed.

[*22] reimbursements were accounted for in the parties' stipulated method of deriving Ms. Sham's income for these years. Thus, if she had showed that the reimbursement was indeed for a deductible expense that she had actually paid, then she might be entitled to a deduction, notwithstanding the reimbursement. However, Ms. Sham has not established for any of the years at issue any specific expenditures from her own income that correspond with any particular expense repayment. Accordingly, we find that she is entitled to no additional deductions on the supposed basis that she had included in her gross income reimbursements for deductible expenses that she had paid.

H.    Medical expenses

1.    Deductible expenses

2010. In 2010 Ms. Sham had a major surgery that was very complex, requiring three separate surgeons. During 2010 and the years thereafter, Ms. Sham was very depressed, received much heavy medication, and was treated by multiple psychologists and psychiatrists. Ms. Sham also hired and paid $2,870 to a Ms. Garcia, who assisted Ms. Sham at home during her illness but was not a

[*23] medical professional.[11]  Ms. Sham paid $436 for edible aromatic oils from "Original Swiss Aromati" that were not medically prescribed to her.

The parties agree as to $54,404 in deductible medical expenses that Ms. Sham paid for 2010.  Relevant to Ms. Sham's claim for local transportation expenses, see supra pt. I.G.2.b, the Commissioner's concession included transportation expenses of $1,002 that Ms. Sham originally sought to claim as a business expense deduction and then distinguished from her other reported transportation expenses as transportation to and from medical appointments.  The Commissioner disputes the deductibility of the $436 for aromatic oils and the $2,870 paid to Ms. Garcia, and he disputes that Ms. Sham has substantiated $600 worth of medical expense payments for services he agrees are deductible.[12]  As we explain below in part II.D.1.c, these additional amounts are not deductible, so she substantiated medical expenses totaling $54,404.  In part I.H.2.a below we discuss

---

[11]In 2012 Ms. Sham paid $2,675 to Ms. Garcia, which she claimed was an expense for office help/maintenance.

[12]The $600 difference appears to arise from aritmetic errors in adding up various services for two medical care providers, and in both instances we agree with the Commissioner's addition, finding that Ms. Sham substantiated only $7,290 in payments to Irena Ginsberg for acupuncture (not $7,490) and $1,800 in payments to Maria Iager (not $2,200).

[*24] reimbursement of a portion of those 2010 expenses by Ms. Sham's insurance provider(s).

2011. For 2011 Ms. Sham reported on her return itemized deductible medical expenses of $21,272, and the Commissioner concedes that amount.

2012. Ms. Sham proved at trial that in 2012 she paid $27,602 in medical expenses, an amount slightly larger than the amount of itemized deductible medical expenses of $26,582 that she reported on her return and that the Commissioner concedes.

2013. For 2013 Ms. Sham reported on her return itemized deductible medical expenses of $16,552, and the Commissioner conceded this amount at trial. (Without the benefit of this concession, we would find that she proved only $5,584 in itemized deductible medical expenses, consisting of $2,579 in co-payments and $3,005 for acupuncture, because she took a separate deduction for the expense of self-employed health insurance.)

For 2013 Ms. Sham claimed a separate deduction of $12,561 for the expense of her self-employed health insurance (instead of including that expense among her other itemized medical expenses on Schedule A, "Itemized Deductions"). The Commissioner did not challenge that deduction in the SNOD. At trial Ms. Sham substantiated additional payments for health insurance with

[*25] copies of checks she wrote for the premiums, the total amount and purpose of which the Commissioner does not dispute, which bring the total substantiated amount to $18,996. We find she paid this amount for health insurance.

2014. For 2014 Ms. Sham reported on her return itemized deductible medical expenses of $12,017. At trial Ms. Sham argued that she paid $4,095 for insurance co-payments and $2,780 for acupuncture, totaling $6,875. The Commissioner has conceded that Ms. Sham paid the acupuncture expense and that it is deductible, and he has also conceded $520 of the co-payment expense, totaling $3,300 in itemized deductible medical expenses for 2014. Ms. Sham has not proven any amounts over the Commissioner's concessions.

The Commissioner does not dispute--and we find--that in 2014 Ms. Sham paid, in addition to the foregoing medical expenses, $8,605 for self-employed medical insurance.

2015. For 2015 Ms. Sham did not itemize her deductible medical expenses on her return but instead took the standard deduction. At trial she proved only $675 of co-payments for medical services--an amount the Commissioner does not challenge.

**[\*26]** The Commissioner does not dispute--and we find--that in 2015 Ms. Sham paid, in addition to the foregoing medical expenses, $8,831 for self-employed medical insurance.

2.    Reimbursements from health insurance

a.    2010

Ms. Sham originally had an individual health insurance plan with United Healthcare Oxford ("Oxford plan") which had high premiums and strict requirements for covering out-of-network treatment. The policy specified procedures to make claims for reimbursements for certain types of services. The Oxford plan required pre-authorization for all hospitalizations and inpatient or outpatient surgical procedures, which Ms. Sham did not obtain. In 2010 she switched plans to Horizon Blue Cross Blue Shield ("Horizon plan"), which had a deductible; later in 2010 she changed insurance plans again to Empire Blue Cross Blue Shield ("Empire plan").

During 2010 Ms. Sham submitted her medical expenses to her health insurance provider for reimbursement and did receive some reimbursement payments. Beginning in 2011 Ms. Sham's bank records for her personal checking accounts ending in -0964 and -4477 reflect that she received reimbursements under the Horizon plan and then later under the Empire plan. However,

[*27] Ms. Sham's bank records in evidence are incomplete and do not contain any copies of checks deposited in her accounts in the year 2010; they do not contain copies of any checks deposited in 2011 before July. (Ms. Sham provided her monthly bank statements for all of the years at issue but separately provided copies of checks that correspond with certain deposits and withdrawals on the accounts.)

The Commissioner contends that Ms. Sham received reimbursements from her health insurer in 2010. To support this contention he points to: (1) various deposits into her account ending in -0964 that appear on the account statements for 2010, (2) her evident routine, documented for subsequent years, of submitting reimbursement requests to her insurance companies (and receiving reimbursements), and (3) her testimony admitting that she did submit some reimbursement requests in 2010 and did receive some reimbursements. The Commissioner posits that certain deposits into Ms. Sham's account ending in -0964 totaling $14,706 are attributable to reimbursements from insurance.

We find, on the basis of the amounts and frequency of the deposits, the high level of medical care that Ms. Sham received in 2010, and the absence of any other credible explanation for the deposits, that deposits into Ms. Sham's account ending in -0964 that total $10,149 (not the Commissioner's larger total) were

[*28] medical expense reimbursements from her health insurance provider.[13] Her account statements for the -0964 account reflect numerous deposits throughout the year, including regular unemployment compensation and, in the latter half of the year, regular deposits for more significant amounts in "round" increments--e.g., $6,000, $7,000, $10,000. None of those deposits is included in the $10,149 of irregular deposits in "odd" amounts consistent with other insurance reimbursements that Ms. Sham received. Ms. Sham did not show an alternative source for any of these deposits. The preponderance of the evidence shows that $10,149 of the deposits reflects those reimbursements. (This $10,149 amount reduces her $54,404 in deductible medical expenses reported on Schedule A to $44,255. See infra pt. II.D.1.d.)

    b.    2011-13

For the years 2011 through 2013 Ms. Sham's own bank statements, which include copies of canceled checks, reflect that the amounts the Commissioner asks us to find are reimbursements of medical expenses were payments from her health

---

[13]The deposit amounts were $3,755 on January 8, 2010; $1,186 on March 9, 2010; $1,485 on May 27, 2010; $705 on December 6, 2010; $820 on December 13, 2010; and $2,198 on December 30, 2010. The Commissioner argues that an additional $4,560 on June 10, 2010, also represented a reimbursement of medical expenses. However, because there was a check withdrawn on the account in the identical amount of $4,560 one day prior, we find that explanation unlikely.

[*29] insurance deposited in the relevant tax year. Consequently, the preponderance of the evidence establishes that she received reimbursements for medical expenses in the amounts of $4,112 in 2011, $6,620 in 2012, and $2,377 in 2013.

### c. 2014-15

There is no evidence (nor does the Commissioner contend) that Ms. Sham received reimbursements for deductible medical expenses reported for 2014 or 2015.

### I. State income tax refund

Ms. Sham made payments of New York State income tax totaling $12,022 for the year 2010, and she claimed her State tax paid as a deduction on her Federal income tax return for 2010. She did not file her New York State income tax return for 2010 until 2014, and on that State return Ms. Sham claimed a State tax refund of $12,022. New York paid Ms. Sham the State tax refund in 2014 and submitted Form 1099-G, "Certain Government Payments", to the IRS reporting that the $12,022 had been refunded to Ms. Sham in 2014, but Ms. Sham did not report that refund on her late Federal income tax return for 2014 (filed in 2017). We find that Ms. Sham received a refund of New York State income tax in 2014 (and for the reasons stated below in part II.B.2, the inclusion of that refund in her income for

**[\*30]** 2014 depends on a computational issue regarding her Federal income tax liability for 2010).

## J. Taxable interest and dividends

The parties agreed that Ms. Sham received taxable interest income of $198 in 2011; $104 in 2012; $11 in 2013; and $10 in 2014. The parties also agreed that Ms. Sham received taxable dividend income of $141 in 2013 and $53 in 2014.

## K. Charitable contributions

The Commissioner did not challenge in the SNOD the deductions Ms. Sham claimed on her returns for charitable contributions for 2010 and 2011. As we explain below in part I.L, Ms. Sham carried forward all of the amounts she reported for charitable contributions for the years 2012 through 2014 and did not claim any charitable contribution deductions for 2015. Her litigating position is that she is entitled to deduct charitable contributions for each of the years at issue.

Ms. Sham's credit card statements show various amounts of $500 or more that were paid to the following entities which she contends were charitable contributions: on December 1, 2013, a $1,500 payment to "Vipassana Meditation, Shelburne, MA" (classified on the statement as "other purchases and cash"); on September 12, 2015, a $500 payment to "Northwest Vipassana, MA" (classified on the statement as "charities and other organizations"); and on September 13,

[*31] 2015, a $60 payment to "Pariyatti, WA" (also classified on the statement as "charities and other organizations"). Ms. Sham did not offer into evidence any receipt or other written acknowledgment from any of these entities.

L.   Tax returns

Ms. Sham filed her Federal income tax returns for 2010-13 on the following dates:

| Year | Date |
|------|------|
| 2010 | Apr. 19, 2014 |
| 2011 | Aug. 10, 2015 |
| 2012 | Aug. 17, 2015 |
| 2013 | Oct. 19, 2015 |

After filing her petition, Ms. Sham submitted to the IRS tax returns for 2014 and 2015 on the following dates:

| Year | Date |
|------|------|
| 2014 | July 25, 2017 |
| 2015 | September 2018 |

Ms. Sham hired professional accountants to prepare her tax returns for all six years at issue, spending $300 on tax preparation fees in 2013 and $800 in 2014. Ms. Sham's tax returns show that four different professionals signed her tax returns as a "paid preparer" during the years at issue: one in Hauppauge, New York, for 2010; another in Clifton, New Jersey, for 2011 through 2013; a third in

[*32] Highland Park, New Jersey, for 2014; and a fourth in Hyde Park, New York, for 2015. She did not call any return preparer to testify at trial.

When testifying about her return positions, Ms. Sham made repeated references to "the accountant", never distinguishing among the various preparers she used or referring to any of them by name. For example, she asserted that the accountant included her 2014 State tax refund in her Schedule C gross receipts; the accountant determined that she should separate her rent expense onto two different Schedules C and determined how much was "reasonable and customary" as a deduction; the accountant had "done mileage calculations" to explain deductions claimed for business use of a personal vehicle. Depreciation deductions that she could not explain were the accountant's idea. With respect to these return positions, Ms. Sham either could not explain how the accountant postulated the item claimed on the return, or in some instances seemed to disclaim the items, leaving them unexplained. In her closing argument, referring again to what she alleged was the accountant's idea to generate two Schedules C, Ms. Sham implied that she signed a return that she did not understand, after being persuaded by the accountant that "this is the way it is done."

Ms. Sham made only general statements regarding the information she provided to the accountants to prepare her returns: "I would give them proof of

[*33] payments like, how [sic] are the invoices and for 2010 because of the year of the surgery, I was not very well organized. I generally give them a lot of material. So they organized it in whichever way." She did not provide specific detail about the information she provided to the accountants for each of the years at issue, with one exception: Exhibit 65-P was admitted for the purpose of showing Ms. Sham's contentions as to what she believed her allowable deductions were for 2011. That document contains spreadsheet entries, typewritten and handwritten lists, and calculations--all apparently composed by Ms. Sham--but no original backup documentation to substantiate the numbers on those papers. Describing that document, Ms. Sham stated: "[S]o everything out here is what I would give to the accountant to do the taxes. This is not what you would see on the tax return." She also attributed the delay in filing her 2014 and 2015 returns to uncertainty about how to treat the TD Ameritrade account and the fact that, while her returns were under audit, her accountant advised her that she was "in bad shape" whether or not she filed the returns.

On line 21 of Schedule A in her tax return for 2010, Ms. Sham claimed "Unreimbursed employee expenses" of $34,563, identified as "Form 2106 Expenses". On her Form 2106, "Employee Business Expenses", she reported: $1,220 of "Parking fees, tolls, and transportation, including train, bus, etc." on

[*34] line 2; $3,461 of "Travel expense while away from home" on line 3; $8,441

of "Meals and entertainment expenses" on line 4 (reduced by 50% to $4,221 on

line 8); and $25,661 in otherwise unexplained "Business expenses not included on

lines 1 through 3". This unexplained $25,661 was the largest part of her

miscellaneous Schedule A expenses subject to the so-called "2% Floor". At trial

and in the parties' stipulations she disclosed that this unspecified amount included

$10,000 in rent for the Manhattan House apartment (plus utilities, telephone, and

internet expenses associated with that apartment) and the legal fees Ms. Sham paid

to both law firms during the year. Ms. Sham did not attach Form 8829, "Expenses

for Business Use of Your Home", to any of her tax returns for the years at issue.

On her tax returns for 2012 through 2014,[14] Ms. Sham reported on

Schedule A "Gifts to Charity" of $2,370 for 2012, $3,100 for 2013, and $1,072 for

2014.

The amount reported for 2013 exceeds the amount of the payment in 2013

described above in part I.K, and no evidence of payment was offered for 2012 or

---

[14]The Commissioner did not disallow in the SNOD Ms. Sham's claimed deductions for "Gifts to Charity" of $845 for 2010 and $2,662 for 2011, so we do not discuss them. On her 2015 return, Ms. Sham did not report any gifts to charity because she did not attach Schedule A to that return, but rather took the standard deduction. Ms. Sham contended at trial that she is entitled to a $560 deduction for gifts to charity for 2015, which is the sum of the payments described above in part I.K.

**[\*35]** 2014. Ms. Sham could not (and did not) actually claim deductions for the reported amounts because she reported that her adjusted gross income in those years was negative, and her contribution base therefore zero. See 170(b)(1)(A), (G). (Ms. Sham now claims deductions, and the Commissioner challenges them.)

On her tax returns Ms. Sham did not report the taxable interest income she had received in 2011-14 and did not report the taxable dividend income that she had received in 2013 and 2014.

On her late Federal income tax return for 2014 (filed in 2017), Ms. Sham did not report the State income tax refund of $12,022 for 2010 that she received in 2014.

Ms. Sham also claimed on her returns losses from the TD Ameritrade account of $157,600 for 2014 and $353,729 for 2015. Limited by section 1211(b)(1), Ms. Sham reported a $3,000 capital loss for each of those years. Consistent with her position that she was not responsible for the activity on the TD Ameritrade account (and was not taxable for its income), Ms. Sham has conceded the losses attributable to those accounts. She attached to her 2015 return the statement for her personal Ameritrade account showing the short-term capital loss of $35,542 and the net long-term capital loss of $255 that we have found she did incur. See supra pt. I.E. (For the reasons we explain below in part II.B.4,

[*36] Ms. Sham is entitled to a capital loss deduction of $3,000 for 2015 but not for 2014.)

M.      Examination and SNOD

The IRS commenced an examination for the years 2010 through 2015. A Civil Penalty Approval Form approving the assertion of penalties for substantial understatements of income tax and, alternatively, negligence, for the years 2010-15 was signed on December 15, 2016, by the "Group Manager" for the IRS examiner who examined Ms. Sham's returns. On January 24, 2017, having not received a 2014 return or a 2015 return from Ms. Sham, the IRS prepared a substitute for return ("SFR") for each of those years pursuant to section 6020(b).

As we noted above, Ms. Sham thereafter submitted untimely returns for 2014 and 2015, but she has not made any payments toward her tax liability for 2014 or 2015.

On February 17, 2017, the IRS issued to Ms. Sham its SNOD for tax years 2010 through 2015, determining a deficiency in tax for each year, as well as additions to tax and a penalty.

On May 12, 2017, Ms. Sham timely filed her petition commencing this case. When she filed her petition, she resided in New York.

**[*37]**                                    II.  OPINION

A.      Applicable legal principles

      1.      Burden of proof

The IRS's determination is presumed correct, and taxpayers generally bear the burden to prove incorrect the adjustments made by the IRS in its SNOD.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  A taxpayer's statement in a brief does not constitute evidence, Rule 143(c), and cannot supplement the record, see Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992).

The IRS may rely on information returns (Forms W-2, "Wage and Tax Statement",  and 1099) from third-party payors when determining a taxpayer's taxable income.  See, e.g., Cabirac v. Commissioner, 120 T.C. 163, 167 (2003), aff'd, 95 A.F.T.R.2d (RIA) 2004-5490 (3d Cir. 2004).  But if "[i]n any court proceeding * * * a taxpayer asserts a reasonable dispute with respect to any item of income reported on an information return filed with the Secretary * * * and the taxpayer has fully cooperated with the Secretary * * *, the Secretary shall have the burden of producing reasonable and probative information concerning such deficiency in addition to such information return."  Sec. 6201(d).

[*38] For the years 2014 and 2015, the Commissioner relied on the Forms 1099-MISC filed by Anesthesia Consultants to reconstruct Ms. Sham's income when he issued the SNOD. At trial Ms. Sham was able to produce credible evidence that the amounts reported by Anesthesia Consultants were inaccurate, a point the Commissioner conceded. The precise extent of the Commissioner's concessions was to reduce Ms. Sham's gross Schedule C receipts to the amounts she reported when she filed her tax return for each of those years, and gross income remains at issue with respect to only the 2014 return. The Commissioner bears the burden of proof on the issue of Ms. Sham's gross income for 2014. He has successfully sustained that burden, as we show below in part II.B.

The Commissioner bears the burden of proof with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a)(1). Ms. Sham contends on brief that the Commissioner's assertion that the expenses Dr. Kukreja "paid against [her] income" are not deductible from her income is a "new repayment theory" and argues that the "repayment theory is unsubstantiated by the evidence on record." In Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989), we stated: "A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. * * * A new

[*39] theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof." See also Shea v. Commissioner, 112 T.C. 183, 191-197 (1999). The repayment of the expenses for which Ms. Sham claimed deductions goes to the issue of their deductible character and does not alter the original deficiency or require different proof. Accordingly, Ms. Sham retains the burden of proof on the issue of these deductions.

During these proceedings Ms. Sham has either raised new deductions or recharacterized the amounts and the nature of the expenses for which she claims deductions. Even though the newly alleged deductions were not directly addressed in the SNOD, the Commissioner does not bear the burden of disproving deductions that a taxpayer belatedly claims. See Rappaport v. Commissioner, T.C. Memo. 2006-87, 91 T.C.M. (CCH) 1079, 1082 (2006). Ms. Sham therefore retains the burden of proof on any deductions she claims in addition to those on her filed returns.

This is not a case where the facts presented on any issue are in equipoise; rather, here we find that the preponderance of the evidence resolves the issues in dispute, thereby negating the import of which party bears the burden of proof. See Dagres v. Commissioner, 136 T.C. 263, 279 (2011).

**[*40]** 2.     <u>Record-keeping</u>

When deductions are in dispute, the taxpayer must satisfy the specific

requirements for any deduction claimed.  <u>See</u> <u>INDOPCO, Inc. v. Commissioner</u>,

503 U.S. 79, 84 (1992).  Furthermore, taxpayers are required to maintain records

sufficient to substantiate items underlying their claimed deductions.  <u>See</u>

sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; <u>see also</u> <u>id.</u> sec. 1.6001-1(e) ("The

books or records * * * shall be retained so long as the contents thereof may

become material in the administration of any internal revenue law").  The failure

to keep and present accurate records counts heavily against a taxpayer's attempted

proof.  <u>Rogers v. Commissioner</u>, T.C. Memo. 2014-141, at *17.

Section 274(d) establishes higher substantiation requirements for expenses

related to travel, meals, and lodging while away from home, entertainment, gifts,

and "listed property", defined in section 280F(d)(4) to include passenger

automobiles and computers--i.e., many of the reported expenses at issue here.  For

expenses associated with "listed property", a taxpayer must prove:  (1) the amount

of each separate expenditure with respect to such property; (2) the amount of each

business use; and (3) the business purpose for an expenditure or use with respect

to such property.  26 C.F.R. sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50

Fed. Reg. 46016 (Nov. 6, 1985).  Section 274(d) provides that no deduction or

[*41] credit under section 162 or 212 shall be allowed for these expenses unless the taxpayer substantiates these expenses by adequate records or sufficient evidence corroborating his own statements.[15]

For travel expenses, not only must a taxpayer substantiate the "[a]mount of each separate [travel] expenditure" and the time and place of the travel, but also she must substantiate the "[b]usiness reason for travel or nature of the business benefit derived * * * as a result of travel." 26 C.F.R. sec. 1.274-5T(b)(2). A deduction for business gifts requires the taxpayer to describe the gift, to substantiate the amount, time, and "business reason for the gift or nature of business benefit derived or expected to be derived as a result of the gift", and to provide information sufficient to establish the business relationship of the gift recipient, such as "name, title, or other designation". Id. subpara. (5).

---

[15]Ms. Sham has urged that we apply the "the Cohan rule", derived from Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). Under that rule, if a taxpayer adequately establishes that she paid or incurred a deductible expense but does not establish the precise amount, then the Court may in some instances estimate the allowable deduction, bearing heavily against the taxpayer whose inexactitude is of her own making. However, section 274(d) sets stricter substantiation rules that, when they apply, supersede the Cohan doctrine. See Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

[*42] Ms. Sham has offered various records in the form of credit card and account statements to substantiate her expenditures. While she has cross-referenced many of these expenditures with self-generated spreadsheets that list the date and amount of certain expenses, her records do not contain any contemporaneous indication of the business purpose for any given expenditure--whether the expense was for a taxi, a meal, or something else. At trial Ms. Sham testified to the business purpose of her attendance at certain conferences, the expenses of which the Commissioner ultimately conceded had a business purpose. With few exceptions, see infra pt. II.E, we find that Ms. Sham otherwise failed meet her burden to establish the deductibility of her business expenses, and we are unable to apply the Cohan rule in these circumstances.

B.    Income issues

    1.    Schedule C income for 2014

The only year for which the parties have not resolved the issue of Schedule C gross receipts by agreement is 2014. As we explain below, we find that the evidence at trial was sufficient to establish that Ms. Sham's gross receipts were at least $71,451, which the Commissioner in his answering brief conceded is the "correct amount". This is the amount that Ms. Sham claimed on her late-filed return and that she affirmed at the beginning of the trial was the amount she

[*43] contends is her gross receipts from self-employment.  Given her position at trial, the Commissioner had no reason to pursue further the amount of her 2014 gross receipts.

However, in her post-trial brief Ms. Sham contends that her gross receipts for 2014 should be further reduced by $20,838, an amount that is the sum of two alleged mortgage payments made for Dr. Kukreja's benefit from the account ending in -0964 on September 15 and October 7, 2014--a contention that the Commissioner had no occasion to examine at trial.  While these payments do appear to be mortgage payments, this fact alone does not establish that these payments should be subtracted from Ms. Sham's 2014 gross receipts of $71,451.  They might instead have been gifts she made to Dr. Kukreja, or payments of a debt she owed to him, or capital investments in his business; but we see no reason that they should necessarily reduce her gross receipts.

And if we were to entertain her late retraction of the $71,451 total and were to reconsider the quantity of her 2014 gross receipts, then we would apparently find a larger amount to be more probable than not.  Deposits into account -0964 in 2014 that total $52,400 evidently constitute business gross receipts.[16]  Ms. Sham

---

[16]A bank deposit is prima facie evidence of income.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  The total amount of all of the deposits in

(continued...)

**[*44]** also conceded at trial and on brief that the $35,000 that Dr. Kukreja paid toward the rent on Apartment 16A constituted additional business gross receipts. This addition would yield a total of $87,400 of probable gross receipts. And the amount might have grown even further if Ms. Sham had not waited until after trial to disclaim what she reported on her return, and if the Commissioner had had the incentive and occasion to challenge Ms. Sham's reduced amount. The evidence shows other monies deposited in her name in other accounts she had at the time, which the Commissioner might have contended were additional gross receipts. Instead, the Commissioner limited himself to contending only what Ms. Sham had reported on her return and stated at the beginning of trial that only $71,451 constituted gross receipts to her. The preponderance of the evidence shows that Ms. Sham received at least $71,451 in gross receipts for 2014. Accordingly, we

---

[16](...continued)
the account ending in -0964 alone in 2014 is $64,400; but of that total, $12,000 is apparently not taxable income. (It evidently consisted of amounts transferred from another account in Ms. Sham's name ending in -4477, and the Commissioner has not argued that deposits into the account ending in -4477 consist of items of her taxable income.) This leaves $52,400 of deposits to account -0964 that must be accounted for. Of that amount, Ms. Sham's brief characterized one $25,000 check from Perioperative Consultants as business gross receipts; she concedes that an additional deposit of $12,400 on October 1, 2014, which appears to correspond with a separate canceled check from Perioperative Consultants, also consists of business gross receipts; and she does not explain the source of any of the other deposits to account -0964. It thus appears that $52,400 of the 2014 deposits to account -0964 was business gross receipts.

[*45] find that her gross receipts for 2014 are the amount she reported on her tax return:  $71,451.

2.      State tax refund

A refund of State tax is taxable to the recipient taxpayer only to the extent of any Federal tax benefit realized as a result of the deduction claimed for the State tax in a prior year.  See sec. 111(a).  The State of New York reported that in 2014 it made a State tax refund to Ms. Sham of $12,022 for State tax paid in 2010.  Ms. Sham's 2010 Federal income tax return shows that she reported alternative minimum tax ("AMT") for 2010, and State income tax is not deductible in computing the AMT income on which the AMT is based.  Sec. 56(b)(1)(A)(ii).  Therefore a taxpayer who itemizes State tax on Schedule A but is also liable for AMT does not receive a Federal tax benefit for the tax within the meaning of section 111(a).  Ms. Sham raises two issues regarding whether she should include it in her income for 2014:  first, she argues that she did in fact report the refund on her return for 2014 (but not on the appropriate line of the return); second, she disputes whether she in fact "received" the refund that New York reported it issued to her.

Ms. Sham initially took the position at trial that the $12,022 State tax refund for 2010 was included (in error) in the $71,451 of business gross receipts she

[*46] reported for 2014. However, Ms. Sham properly reported refunds of State tax on the appropriate line of her tax returns for prior years. Moreover, her explanation of how she arrived at the amount of her gross receipts for 2014 (by arguing that only certain deposits into the account ending in -0964 were actually income to her) did not include a $12,022 deposit of State tax. We find that she did not include the refund of New York tax on her return for 2014.

Next, she argues that the Commissioner did not prove that she received the refund. In light of her first argument (that she reported the refund) and the evidence before us, we doubt the credibility of this assertion. Ms. Sham's New York income tax return for 2010 included a claim for a refund of $12,022. The only New York State tax return in the record is for 2010, so we are unable to determine whether Ms. Sham may have received, instead of a refund, a credit against any other New York tax liabilities. We do not find that Ms. Sham, having insisted that she reported the New York State refund as income for 2014, raised a reasonable dispute to New York's 1099-G that reported that refund. The burden of proof on this item therefore did not shift under section 6201(d). We find that Ms. Sham has failed to prove that she did not receive a State tax refund of $12,022 in 2014. However, whether she must include the refund in income for 2014 is a computational issue that depends on whether, on the basis of our findings for

[*47] 2010, she will continue to owe AMT for that year. Ms. Sham will include the $12,022 in income for 2014 only to the extent (to be resolved in the Rule 155 computation) that she does not owe AMT for 2010. See, e.g., Ashkouri v. Commissioner, T.C. Memo. 2019-95, at *41.

### 3. Interest and dividends

The IRS determined from third-party reporting on Forms 1099 that Ms. Sham received small amounts of interest income in 2011 through 2014 and small amounts of dividend income in 2013 and 2014. Ms. Sham has conceded these amounts, which are set forth in detail in Appendix A.

### 4. Capital gain/loss for 2014 and 2015

The parties have agreed that Ms. Sham is not entitled to deduct capital losses from the TD Ameritrade account in the amounts of $157,600 for 2014 and $353,729 for 2015, both years for which she reported a $3,000 capital loss pursuant to the limitations of section 1211(b)(1). The Commissioner argues that the effect of Ms. Sham's concession of the TD Ameritrade account losses is that she is not entitled to deduct a $3,000 capital loss for either of those years. In her reply brief, however, Ms. Sham counters that she sustained other capital losses in her personal Ameritrade account. Ms. Sham has not substantiated any capital losses for 2014. However she did substantiate a short-term capital loss of $35,542

[*48] and a net long-term capital loss of $255 for 2015 in her personal Ameritrade account. Pursuant to sections 1211(b)(1) and 1212(b)(1), she is entitled to a capital loss deduction of $3,000 for 2015, and a corresponding reduction in the short-term capital loss (i.e., from $35,542 to $32,542) available as a carryforward. Sec. 1212(b)(2)(A)(i).

C.    2010 Schedule A miscellaneous expenses

For 2010 a taxpayer may claim an unreimbursed employee business expense as a miscellaneous deduction on Schedule A, pursuant to section 162(a). An employee is considered to be in the business of being an employee and may deduct expenses that are:  (a) nonreimbursable, (b) related to the employee's trade or business of rendering services to the employer, and (c) ordinary and necessary expenses of such a trade or business. See Lucas v. Commissioner, 79 T.C. 1, 6-7 (1982). Expenses are "ordinary" when they are "normal, usual, or customary" in the taxpayer's trade or business. Deputy v. DuPont, 308 U.S. 488, 495 (1940). Expenses are "necessary" when they are "appropriate" or "helpful," even if not "indispensable" or "required." Ford v. Commissioner, 56 T.C. 1300, 1306 (1971), aff'd per curiam, 487 F.2d 1025 (9th Cir. 1973). Unreimbursed employee expenses are subject to the itemized deduction limitation of section 67(a)--i.e., the 2% floor.

[*49] The employee business expense deductions that Ms. Sham claimed must be disallowed because she did not substantiate the expenses. The preponderance of the evidence shows that she was unemployed (and collected unemployment benefits) for the entire duration of 2010. Even if the evidence showed that Ms. Sham continued to work as an employee for her former employer while she was at home "unwinding" investment positions in 2010 (which it does not), in order to be deductible, the expenses she paid would have to have been ordinary and necessary in the course of her business as an employee. See sec. 162(a). The expenses she reported for having a home office (rent and utilities) and for parking tolls, professional supplies and services, promotional gifts, computer expenses, and legal expenses (other than the $6,210 for the dispute with her prior employer that the Commissioner has conceded) are simply not substantiated as paid for any specific business purpose and therefore cannot be characterized as "ordinary and necessary". Ms. Sham has not shown that any portion of her apartment was used exclusively and on a regular basis as the principal place of the business she carried on as an employee as required by section 280A(c)(1). She has offered no convincing explanation for any of the other expenses to explain how they are related to her alleged employer's business. Personal expenses are not deductible. Sec. 262; Hamacher v. Commissioner, 94 T.C. 348, 359 (1990). Therefore, other

[*50] than those deductions the Commissioner has conceded, we find that Ms. Sham is not entitled to deduct Schedule A unreimbursed employee expenses for 2010.

D.    Schedule A itemized deductions

1.    Medical expenses

a.    Medical expenses generally

Medical expenses which are "not compensated for by insurance or otherwise" are deductible, subject to computational limitations. See sec. 213(a) (for tax years 2010 through 2012, such expenses are deductible to the extent they exceed 7.5% of a taxpayer's adjusted gross income; for tax years 2013 through 2015, such expenses are deductible to the extent that they exceed 10% of the taxpayer's adjusted gross income).[17]  Ms. Sham bears the burden to prove that she paid any expense and that it was not reimbursed. See Weaver v. Commissioner, T.C. Memo. 1984-634, 49 T.C.M. (CCH) 249 (1984) (burden met where taxpayer testified that no claim for reimbursement was filed and record contained no evidence to the contrary).

---

[17]Unless otherwise stated, amounts described here as itemized deductible medical expenses are the amounts before the application of the section 213(a) limitation.

[*51] The expense of health insurance for the taxpayer is itself a deductible medical expense, see sec. 213(d)(1)(D), but a taxpayer who is self-employed is permitted, to the extent of her earned income from her trade or business, to claim it as a separate deduction--as an above-the-line adjustment to income, as opposed to an itemized deduction, see sec. 162(l)(1) and (2)(a). Any amount deducted for health insurance cannot also be taken into account in computing the medical expense deduction under section 213(a). Sec. 162(l)(3).

### b.    Self-employed health insurance expense

Ms. Sham was self-employed in the years 2011 through 2015, and for the years 2013 through 2015, she claimed separate deductions for the expense of her self-employed health insurance (instead of including that expense among her other itemized medical expenses on Schedule A). We have found, see supra pt. I.H.1, that Ms. Sham paid for health insurance in the following amounts, which she may deduct above the line (rather than on Schedule A):

| Year | Health insurance premiums as claimed | Health insurance premiums as allowed |
|------|--------------------------------------|--------------------------------------|
| 2013 | $12,561 | $18,996 |
| 2014 | 8,605 | 8,605 |
| 2015 | 8,831 | 8,831 |

**[\*52]**      c.      <u>Unreimbursed itemized deductible medical expenses</u>

<u>2010</u>. For 2010 Ms. Sham reported on her return itemized deductible medical expenses totaling $61,230; her position after trial is that these expenses totaled $58,309 for 2010. As we noted above, <u>see</u> <u>supra</u> pt. I.H.1, of the $58,309 she claims, the only expenses that the Commissioner challenges on grounds of deductibility are $436 spent on aromatic oils and $2,870 paid to Ms. Garcia. Ms. Sham has argued that the edible aromatic oils were prescribed to her, but her failure to offer proof precludes any deduction. <u>See</u> sec. 213(b). Ms. Garcia's services were not medical and therefore were not deductible. <u>See</u> <u>Green v. Commissioner</u>, T.C. Memo. 2010-109, 99 T.C.M. (CCH) 1444, 1448 (2010) (housekeeper hired to help preserve mental health of the "meticulous" taxpayer wife was not a deductible medical expense). Consequently, we hold that Ms. Sham substantiated medical expenses of $54,404 for 2010. (We found above in part I.H.1 that the $600 difference between the two amounts is attributable to Ms. Sham's arithmetic error.)

However, section 213(a) allows a deduction only for medical expenses "not compensated for by insurance or otherwise", and we have found, <u>see</u> <u>supra</u> pt. I.H.2.a, that $10,149 of those expenses were reimbursed by Ms. Sham's health insurer. Her itemized deductible medical expenses for 2010 are therefore $44,255.

[*53] 2011. For 2011 Ms. Sham reported on her return itemized deductible medical expenses of $21,272, and the Commissioner concedes the amount of the deduction. See supra pt. I.H.1. We have found that in 2011 she received reimbursements of $4,112, see supra pt. I.H.2.b, that reduce total medical expenses to yield the deductible, unreimbursed portion; but since the Commissioner has conceded the amount of the itemized deductible medical expenses, he has conceded that the $21,272 is net of reimbursements, so we do not reduce that total further.

2012. Ms. Sham proved at trial that in 2012 she paid $27,602 in medical expenses, an amount slightly larger than the deduction of $26,582 that she claimed on her return and that the Commissioner concedes. We have found, see supra pt. I.H.2.b, that in 2012 she received $6,620 in reimbursements from her health insurance company. Such reimbursements would reduce the deductible amount, and if we subtract that amount from the proven expenses, we would reduce them from $27,602 to $20,982. However, we hold the Commissioner to his concession of the amount of itemized deductible medical expenses, and we therefore allow Ms. Sham the amount she reported and that he conceded: $26,582.

2013. For 2013 Ms. Sham reported on her return itemized deductible medical expenses of $16,552, and the Commissioner conceded this amount at

[*54] trial.[18]  See supra pt. I.H.1.  Because the Commissioner has thus conceded the amount of the unreimbursed itemized deductible medical expenses for 2013, we hold him to that concession and do not make any reductions for reimbursements of $2,377 for 2013.  See supra pt. I.H.2.b.

2014.  We have found that for 2014 Ms. Sham paid deductible medical expenses of $3,300.  There were no insurance reimbursements, so she is entitled to itemized deductible medical expenses of $3,300.

2015.  We have found that for 2015 Ms. Sham paid deductible medical expenses of $675.  There were no insurance reimbursements, so she is entitled to itemized deductible medical expenses of $675.

        d.      Summary of deductible medical expenses

We hold that the itemized deductible medical expenses that Ms. Sham is entitled to deduct as unreimbursed medical expenses on Schedule A[19] for the tax

---

[18]On brief the Commissioner argues that if we find (as we have) that Ms. Sham's self-employed health insurance deduction was higher than the deduction he did not challenge in the SNOD, then we should not hold him to his concession in 2013 as to the amount of Ms. Sham's deductible itemized medical expenses and should limit Ms. Sham to the lower amount ($5,584, less $2,377 in reimbursements, totaling $3,207) that she proved at trial.  We disagree.  These are distinct items.

[19]These amounts exclude health insurance expenses for tax years 2013 through 2015 that Ms. Sham reported as a separate deduction for self-employed

(continued...)

[*55] years 2010 through 2015 are as stated below.  We show here the amounts

that she claimed at trial, the amounts that she substantiated, the amounts of

reimbursements that she received, and the net itemized deductible medical

expenses as follows:

| Year | Claimed | Substantiated | Reimbursed | Allowed[1] |
|------|---------|---------------|------------|-----------|
| 2010 | $61,230 | $54,404 | $10,149 | $44,255 |
| 2011 | 21,272 | 21,272 | 4,112 | 21,272* |
| 2012 | 26,582 | 27,602 | 6,620 | 26,582* |
| 2013 | 16,552 | 16,552 | 2,377 | 16,552* |
| 2014 | 6,875 | 3,300 | --- | 3,300 |
| 2015 | --- | 675 | --- | 675 |

[1]Amounts that are allowed pursuant to a concession or agreement of the parties are indicated with an "*".

2.    Charitable contributions

Section 170(a) allows as a deduction any charitable contribution made

within the taxable year.  To qualify as a deduction, the contribution must be made

to a donee organization described in section 170(c), including, inter alia, "[a]

corporation, trust, or community chest, fund, or foundation * * * organized and

operated exclusively for religious, charitable, scientific, literary, or educational

---

[19](...continued)
health insurance under section 162(l)).  For 2011 and 2012 Ms. Sham did not claim a separate deduction for self-employed health insurance but rather elected to include that expense as part of her unreimbursed medical expense deduction.

[*56] purposes".  Deductions for charitable contributions are allowable only if verified under the regulations prescribed by the Secretary.  Sec. 170(a)(1).  The deductibility of a charitable contribution is generally limited to 50% of an individual taxpayer's "contribution base" for the taxable year; any excess may be carried forward for the succeeding five years.  See sec. 170(b)(1).

Further, charitable contributions of cash or property of $250 or more must be substantiated by a contemporaneous written acknowledgment ("CWA") from the donee.  See sec. 170(f)(8); 26 C.F.R. sec. 1.170A-13(f)(1), Income Tax Regs.  A CWA is "contemporaneous" if it is obtained by the taxpayer on or before the earlier of the date the taxpayer files the original return for the taxable year of the contribution or the due date (including extensions) for filing the original return for the year.  Sec. 170(f)(8)(C); 26 C.F.R. sec. 1.170A-13(f)(3).  That acknowledgment, which must be furnished by the donee, must (1) state the amount of cash and describe other property contributed, (2) indicate whether the donee organization provided any goods or services in consideration for the contribution, and (3) provide a description and good faith estimate of the value of any goods or services provided by the donee.  Sec. 170(f)(8)(B); 26 C.F.R. sec. 1.170A-13(f)(2).

There is no evidence that the entities to which Ms. Sham claims she made charitable contributions are qualifying donee organizations under section 170(c).

**[*57]** Even if they were, we have no evidence that Ms. Sham's payments were in fact donations. Rather, these entities appear to be organizations that offer meditation services, and that fact suggests, in light of other evidence, that Ms. Sham's payments to them were more likely to have been consideration for goods or services from the organization, which would preclude their deductibility. See 26 C.F.R. sec. 1.170A-1(h), Income Tax Regs.

Ms. Sham claims deductions for charitable contributions for each of the years 2012 through 2015. She has provided no documentary evidence other than her credit card account statements for 2013 and 2015. (She also proffers her tax returns for the years for which she reported an itemized amount for "Gifts to Charity" (2012 through 2014), but these returns are not evidence, since the reporting of an item on a return does not substantiate that item. See Lawinger v. Commissioner, 103 T.C. 428, 438 (1994) ("Tax returns do not establish the truth of the facts stated therein").)

As to the $1,500 payment to Vipassana Meditation in 2013 and the $500 payment to Northwest Vipassana in 2015, we find that Ms. Sham has failed to meet the substantiation requirements for contributions over $250 set forth above. With respect to the $60 payment to Pariyatti, WA, she has failed to establish that this was a charitable donation and not a payment of consideration. We hold that

[*58] she is not entitled to deduct the following amounts she claims were charitable contribution deductions, or to carry forward any "unused" amounts thereof:  $2,370 for 2012; $3,100 for 2013; $1,072 for 2014; and $560 for 2015.

E.    Schedule C expenses

Section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  To prove entitlement to deduct an expense, the taxpayer must prove not only the fact of the expenditure but also the business purpose.  A taxpayer's general statement that expenses were paid in pursuit of a trade or business is insufficient to establish that the expenses had a reasonably direct relationship to any such trade or business.  Ferrer v. Commissioner, 50 T.C. 177, 185 (1968), aff'd per curiam, 409 F.2d 1359 (2d Cir. 1969).  Personal expenses are generally not allowed as deductions.  Sec. 262(a).

1.    Rent/lease

The evidence shows that Ms. Sham used Apartment 16A for personal rather than business purposes.  See supra pt. I.D.  In support of her contention that she used it as an office, she asserts that she did not seek a deduction of 100% of the rent (but does not state what portion of the apartment was used "exclusively" as an

[*59] office);[20] she also claimed deductions for the expense of meetings held outside of the apartment--in restaurants, for example--and we do not find her argument that the "smell [associated with using the apartment for other than business use] lingers" to be a convincing argument that she used the entire space as an office. When prompted, Ms. Sham was vague about where she lived while she paid rent on Apartment 16A, and we conclude that it was in fact her residence. We hold that the rent expense of Apartment 16A was personal, that she did not prove that any portion of the apartment was used exclusively for her business, and that she is not entitled to deduct any portion of her rent for any of the years claimed (2011 through 2013).

### 2. Depreciation

Ms. Sham did not identify any of the depreciable property for which she claimed a deduction; she offered no substantiation on this issue. We accordingly deny any claimed depreciation deduction for each of the years 2011 through 2014.

---

[20]As we noted above in part II.C, section 280A(c)(1) requires that, in order for an employee to deduct a portion of the cost of her residence as a "home office" business expense, she must use a portion of the home exclusively and on a regular basis as the principal place of the business she carries on as an employee.

**[\*60]** 3.    Office expense

Ms. Sham claimed office expense deductions of $8,085 for 2011, $6,130 for 2012, and $6,293 for 2013, amounts that largely corresponded with the invoices she proffered to show the "expenses paid against income" by Dr. Kukreja. As explained supra part. I.G.4, we find that Ms. Sham did not substantiate that she in fact paid these expenses. Accordingly, we find that she is not entitled to deductions for these expenses. With respect to any other amounts reported as office expenses (including the $1,000 check to herself that Ms. Sham described as "petty cash" for 2012 and checks in various amounts paid to various persons in these three years,[21] none of whom Ms. Sham has established had any connection to her business), we can discern no substantiation of the business purpose for any expense. Accordingly, we deny the office expense deduction for each of the years claimed (2011 through 2013).

---

[21]In 2012 Ms. Sham paid $2,675 to Ms. Garcia, which she argues is a deductible expense for "office help/maintenance". In light of Ms. Sham's other unsubstantiated claim that payments of $2,870 to Ms. Garcia in 2010 were for medical expenses and the complete lack of evidence as to what specific services Ms. Garcia in fact did provide, we deny any deduction for these payments (as well as other payments made to other individuals whose alleged services remain undisclosed, falling far short of being substantiated as a business expense).

[*61] 4.    Utilities

The Commissioner did not challenge Ms. Sham's deductions for utilities for 2011, 2012, and 2013.  For 2014 and 2015, Ms. Sham took the position that her utility expenses were deductible because they were paid for her alleged home office at Apartment 16A.  Because we find that she did not sustain her burden to prove entitlement to any deductions associated with a home office, we deny the deductions claimed for utilities for 2014 and 2015.

5.    Car/truck

Petitioner claimed car and truck expense deductions of $9,821 for 2011, $7,372 for 2012, and $7,577 for 2013.  Because passenger automobiles constitute "listed property", petitioner's reported car and truck expenses are subject to the heightened substantiation requirements described above in part II.A.2.  See Fernandez v. Commissioner, T.C. Memo. 2011-216, 102 T.C.M. (CCH) 242, 244 (2011).  To satisfy these requirements, "a taxpayer must substantiate each element of an expenditure or use * * * by adequate records or by sufficient evidence corroborating * * * [her] own statement."  26 C.F.R. sec. 1.274-5T(c)(1).  A contemporaneous time log or other record "made at or near the time of the expenditure or use" is afforded

[*62] a high degree of credibility not present with respect to a statement prepared subsequent * * * [to the recorded event] when generally there is a lack of accurate recall. Thus, the corroborative evidence required to support a statement not made at or near the time of the expenditure or use must have a high degree of probative value to elevate such statement and evidence to the level of credibility reflected by a record made at or near the time of the expenditure or use supported by sufficient documentary evidence.

Id.; see also Flake v. Commissioner, T.C. Memo. 2014-76, at *11-*12. Lacking adequate records, the taxpayer must produce other credible evidence sufficient to corroborate her own statements concerning business use. 26 C.F.R. sec. 1.274-5T(c)(3).

The automobile expenses Ms. Sham has reported do not relate to a vehicle that she in fact owned; rather, Dr. Kukreja lent her one of his automobiles and paid the expenses associated with her using the vehicle, as reflected in the invoices showing "expenses paid against [Ms. Sham's] income". The expenses on those invoices--$6,455 for automobile maintenance in 2011; $5,640 for automobile repairs in 2012; and $5,521 for auto repairs in 2013--were less than the amounts reported on her return in each year. We find that Ms. Sham is not entitled to the car/truck expense deductions in the amounts set forth in the invoices because she did not incur these expenses; as to the remaining amounts claimed, we hold on the

[*63] basis of the heightened requirements of section 274(d) that she failed to substantiate them.

6.    Travel

Travel expenses are also subject to the heightened substantiation requirements of section 274(d).  Ms. Sham conceded travel expenses for 2011, and for other years the Commissioner has conceded some expenses for travel to medical conferences for professional development.  See supra pt. I.G.2.c.; infra pt. II.E.7.f.  Still at issue are the years 2012 through 2015, for which Ms. Sham seeks deductions attributable to hotel, meals,[22] and airfare for trips to Amritsar, India (to visit her father); Amsterdam, Netherlands (related to a soft-skills training); Paris, France; and Charlotte, North Carolina, and other hotel and transport expenses she submits on brief were to see or meet with professionals in the fields of Ericksonian hypnosis and MRP.  See supra pt. I.G.2.d.  Some of the travel expenses that Ms. Sham reports are different from or greater than the expenses she reported on her tax returns.  Ms. Sham relies primarily on credit card statements and on her argument in her brief to explain these deductions; she has not substantiated with evidence a business purpose for any of these trips.  None of

_____

[22]A small portion of the expenses was claimed for meals, an expense for which she separately claimed a deduction for each of the years at issue.  See infra pt. II.E.7.g.

**[*64]** the trips pertained to marketing or business development undertaken for her only paying client during the years at issue, whose business interests were focused in expanding an anesthesiology practice into the yet unpenetrated areas of the New York and New Jersey markets. Accordingly, other than the travel expense that the Commissioner conceded as a portion of "Other" expenses related to conferences for professional development (addressed below), we deny the travel expense deduction for each of the years claimed (2012 through 2015).

7.   Other[23]

For tax years 2011 through 2015, Ms. Sham reported additional expenses on her Schedules C classified as "other", sometimes describing differently in different years what appear to be the same categories of expenses, as follows:

a.   "Local transport"

This expense appears to correspond with taxi, ride-sharing, shuttle, and other transit payments, for which Ms. Sham provided credit card statements and some spreadsheets indicating the dates and amounts of the payments, but no information to support their supposed business purpose. For most years the total expense reported does not correspond clearly to the amounts Ms. Sham contends

_____

[23]Ms. Sham conceded the "Storage" expenses she reported in this category for 2011, 2012, and 2013.

[*65] she paid--for instance, for 2012 she claimed $4,647 in local transport on her return, but her litigating position claimed only $2,450 of local transport. Further, other than the transportation expenses for medical purposes that Ms. Sham reported and that the Commissioner conceded for 2010 in the amount of $1,002, Ms. Sham's records do not clearly delineate between expenses allegedly made for business transportation and those made for any other transportation. Other than the conceded amounts, we hold that Ms. Sham has not substantiated her local transportation expenses and is therefore not entitled to the deductions she claimed for them.

      b.     <u>"Dues and subscriptions"</u>

In support of her deduction for "professional subscriptions", Ms. Sham's credit card statements show expenditures for periodicals that include the New York Times, the Financial Times, the Economist, and publications regarding women in finance. She also paid small amounts to Financial Women's Association of New York ("FWA") and Young Jewish Professionals ("YJP") in connection with dues and networking events in which she participated with those associations.

The purchase of general circulation newspapers is a non-deductible personal expense. <u>Stemkowski v. Commissioner</u>, 690 F.2d 40, 47 (2d Cir. 1982), <u>aff'g in</u>

**[\*66]** <u>part, rev'g in part</u> 76 T.C. 252 (1981).  Other than the expenses Ms. Sham

paid directly to the professional associations in which she participated, her claims

for deductions in this category were largely unsubstantiated.  We find that she is

entitled to deductions for only the following amounts:  for 2012, $100 (to FWA);

for 2013, $102 (to YJP); for 2014, $165 (to FWA); for 2015, $645 ($543 to FWA

and $102 to YJP).

> c. <u>"IT and technology"</u>

Ms. Sham has offered no credible explanation of her deduction

characterized as "IT and technology" for any of the years at issue.  She has not

substantiated any expenses underlying these deductions.

> d. <u>"Telephone and internet"</u>

The bills for internet service show that they were mailed to the address of

Apartment 16A, which we have found to be Ms. Sham's personal residence.  The

bills for the telephone are apparently for cellular phone service.  Ms. Sham

proffered no specific business purpose for these expenses other than her general

statements, and we find that the telephone and internet services were for personal

use.  Ms. Sham has failed to meet the strict substantiation requirements of section

274(d) for these deductions.

**[*67]**  e.  "Business research and establishment"

Ms. Sham claimed $4,790 as a deduction for business research and establishment for 2011 (and none for any other year at issue). She has not identified, much less substantiated, any expenses that correspond with this deduction.

f.  "Professional development", "conferences", and "continuing education"

The Commissioner has conceded the deductibility of expenses associated with business travel and attendance at medical conferences, totaling $5,981 for 2012, $10,743 for 2014, and $554 for 2015.

The remaining expenses in this category--paid in the years 2012 through 2015--are in dispute. These relate to programming for Ericksonian hypnosis, MRP, and other "soft-skills" training that Ms. Sham argues are ordinary and necessary expenses of her business. As with other expenses at issue, the amounts reported for this category on Ms. Sham's tax returns differ from the amounts she advanced in her litigating position.

| Year | Item | Return position | Litigating position |
|------|------|-----------------|---------------------|
| 2012 | Professional development | $6,825 | $2,274 |
|      | Conferences | --- | 5,981 |

| [*68] 2013 | Professional development | 7,860 | 8,728 |
|---|---|---|---|
| 2014 | Professional development | 7,524 | 9,304 |
| | Conferences | 7,701 | 15,582 |
| | Continuing education | 7,823 | --- |
| 2015 | Professional development | 6,274 | 6,244 |
| | Conferences | 554 | 554 |
| | Continuing education | 9,647 | 6,902 |

Much of what Ms. Sham has offered on this point--including the identities of some of the professionals who have hosted or held these conferences and training sessions--has been not sworn testimony at trial but argument on brief that, as such, we cannot consider. See Rule 143(c).

We resolve this issue against Ms. Sham because she has not proved that her participation in these soft-skills training sessions and programs "[m]aintains or improves skills required by the individual in his employment or other trade or business". 26 C.F.R. sec. 1.162-5(a)(1), Income Tax Regs. The purpose of these sessions was not to learn from a professional in her field of business how to improve a specific skill needed in the business, nor was it to meet professionals

- 69 -

[*69] whom she was pursuing as potential clientele who might hire her as a business consultant. Rather, she attended these sessions to improve her ability to make persuasive in-person presentations; and in some sessions, the form of persuasion undertook unconventional means, such that the content of the courses did not at all resemble skills she would need to promote the business of her only client, an anesthesiologist. At the same time Ms. Sham took this training, she was also recovering from trauma and separating her affairs from those of Dr. Kukreja, who she believed had a negative psychological impact on her. The greater weight of the evidence supports the conclusion that these courses lacked business purposes. We conclude that her principal interest in these conferences was not to improve her skills as a business consultant but to bolster her sense of wellness and her ability to engage in interpersonal relationships. Of course a person is free to attend such events, but they are not primarily business events. Accordingly, Ms. Sham is not entitled to deductions in excess of those the Commissioner has conceded.

g.     "Meals and entertainment"

The Commissioner did not challenge the deductions that Ms. Sham claimed for meals and entertainment for 2011, 2012, and 2013. For 2014 and 2015, the Commissioner conceded Ms. Sham's reported expenses in this category, but with

[*70] the caveat that she did not reduce these expenses by 50% as required by section 274(n), which Ms. Sham admitted. We accordingly hold that Ms. Sham is entitled to deduct half of the expenses she asserts she had in those two years: $628 of the agreed amount of $1,255 for 2014 and $500 of the agreed amount of $1,000 for 2015.

### h. "Outside/professional services"

Ms. Sham claimed, in this category, deductions associated with expenditures at the U.S. Postal Service, Printec, Google Service, and professional accounting services reflected on her personal credit card statements. She did not substantiate business purposes for the expenditures, so to the extent they were disallowed in the SNOD, we find these deductions were properly denied.

However, Ms. Sham's tax preparation expenses were $300 for 2012 and $800 for 2014. The Commissioner has opposed these expenses on Schedules C for lack of business purpose, but we deem Ms. Sham's dispute of the deductions for accounting fees to be construed as claiming the deductions where they would be properly taken, i.e., on Schedules A of her returns. We accordingly find that Ms. Sham may properly deduct $300 in accounting fees for 2012 and $800 for accounting fees for 2014 on her returns because she was able to substantiate that she paid the expenses in connection with her own tax preparation.

**[*71]**     i.     "Promotion" and "gifts"

The "promotion" expenses Ms. Sham reported were synonymous with gift expenses, and her proof of them consisted of her credit card statements showing expenditures for fruit, wine, flowers, and other similar items.  Because they are "listed property", gifts are subject to the heightened substantiation requirements of section 274(d).  Additionally, any deduction for a gift under section 162 is limited to $25 in cumulative value of all gifts to any individual per year.  Sec. 274(b).  Each individual expenditure reported was in excess of $25, and Ms. Sham offered no evidence regarding the identity, much less the business relationship, of any of the recipients of the alleged gifts.  We hold that any deductions for "gifts" or "promotion" were properly denied.

F.     Penalties and additions to tax

   1.     Additions to tax under section 6651(a)(1) and (2)

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a timely return (unless the taxpayer proves that such failure is due to reasonable cause and is not due to willful neglect).  See also United States v. Boyle, 469 U.S. 241, 245 (1985).  The addition consists of 5% per month (up to a maximum of 25%) of "the amount required to be shown as tax on such return".  Sec. 6651(a)(1).  Section 6651(a)(2) provides for an addition to tax for failure to

[*72] timely pay "the amount shown as tax on any return specified in paragraph (1)" unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect. The addition consists of 0.5% per month (up to a maximum of 25%) of "the amount shown as tax on such return". Sec. 6651(a)(2). The amount of the addition to tax under section 6651(a)(2) reduces the addition to tax under section 6651(a)(1) for any month for which both additions to tax apply. See sec. 6651(c)(1). When a taxpayer has not filed a return, the section 6651(a)(2) addition to tax may not be imposed unless the Secretary has prepared an SFR that meets the requirements of section 6020(b). Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). Pursuant to section 6651(g)(2), an SFR prepared by the Commissioner under section 6020(b) is treated as a taxpayer return for purposes of determining the addition to tax under section 6651(a)(2).

In the SNOD the IRS determined against Ms. Sham additions under section 6651(a)(1) for failure to timely file only for 2013, 2014, and 2015, and determined additions under subsection (a)(2) for failure to timely pay only for 2014 and 2015, so we do not consider the other years.

Ms. Sham's tax return for 2013 was due in April 2014 and was filed on October 19, 2015; her tax return for 2014 was due in April 2015 and was filed

**[\*73]** on July 25, 2017; and her tax return for 2015 was due in April 2016 and was filed in September 2018. These facts are not in dispute and are sufficient to establish that the Commissioner has met his burden of production to establish Ms. Sham's liability under section 6651(a)(1). Ms. Sham's only available defense to these additions to tax would be a showing that her failure to file a return for each year at issue was due to reasonable cause and not willful neglect, for which she bears the burden of proof. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001). Ms. Sham has generally argued that her health problems prevented her from being in control of her own affairs to the extent that she could not file her returns on time, and that for 2014 and 2015 her trepidation about how to resolve the issue of the ownership of the TD Ameritrade account prevented her from filing returns because she was unsure about what position to take.

We find these arguments unpersuasive. First, Ms. Sham was able to file her tax return for 2010 in 2014 when her return for 2013 was due. This fact defeats her assertion that her health condition made it impossible for her to file tax returns. Further, the evidence that Ms. Sham has proffered in support of her expense deductions during these years shows that her physical condition did not prevent her from traveling frequently and attending various conferences and events during 2014 and 2015. In light of Ms. Sham's ability to conduct her other affairs, the

[*74] omission of filing her tax returns appears as one of "selective inability" in 2014 and 2015; we find that she lacked reasonable cause for these years. See Wright v. Commissioner, T.C. Memo. 1998-224, 75 T.C.M. (CCH) 2536, 2539 (1998) (quoting Tabbi v. Commissioner, T.C. Memo. 1995-463, 70 T.C.M. (CCH) 836, 849 (1995)), aff'd, 173 F.3d 848 (2d Cir. 1999). Ms. Sham's physical condition improved after 2015, and therefore we conclude that she remained capable of filing a tax return in April 2016.

As to her other arguments regarding her uncertainty about the proper treatment of the TD Ameritrade account, we have held that mistake or ignorance of the law does not excuse a failure to timely file a tax return. See Joyce v. Commissioner, 25 T.C. 13, 15 (1955). Ms. Sham is liable for the additions to tax under section 6651(a)(1) for 2013, 2014, and 2015.

Section 6651(a)(2) imposes an addition to tax for failure to timely pay the amount of tax shown on a return. The liabilities were due to be paid on the unextended due dates of Ms. Sham's returns. See sec. 6151. The addition to tax under section 6651(a)(2) applies only when an amount of tax is shown on a return--in this case, on the SFR that the Commissioner prepared for each of the two years for which the addition was determined. See Wheeler v. Commissioner, 127 T.C. at 210. To constitute a valid SFR under section 6020(b), "the return

**[\*75]** must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'." Spurlock v. Commissioner, T.C. Memo. 2003-124, 85 T.C.M. (CCH) 1236, 1243 (2003). The SFRs for 2014 and 2015 contain sufficient information, purport to be returns, and are subscribed as required by section 6020(b). Accordingly, the Commissioner has met his burden to show that tax was due on the returns (but the additions to tax will need to be recalculated in light of our other findings. See sec. 6651(c).)

As with the section 6651(a)(1) failure-to-file addition to tax, section 6651(a)(2) provides that the taxpayer is liable for the failure-to-pay addition to tax "unless it is shown that such failure is due to reasonable cause and not due to willful neglect". Ms. Sham must show that she exercised ordinary business care and prudence in providing for payment of her tax liabilities in light of her financial situation. See 26 C.F.R. sec. 301.6651-1(c), Proced. & Admin. Regs. Given Ms. Sham's continued expenditures on items unrelated to her business--such as travel, MRP coaching, and costly programs geared toward developing personal skills--despite her continued lack of business prospects other than Dr. Kukreja, we hold that she did not exercise ordinary business care and prudence in providing for payment of her tax liabilities, and we do not find persuasive the reasons she

**[*76]** advances in support of reasonable cause (the same as under section 6651(a)(1), above).

    2.    <u>Addition to tax under section 6654</u>

Section 6654 imposes an addition to tax on an individual taxpayer who underpays her estimated tax. A taxpayer must pay estimated tax for any year in which she has a "required annual payment". Sec. 6654(d). A "required annual payment" is defined in section 6654(d)(1)(B), in pertinent part, as "the lesser of-- (i) 90 percent of the tax shown on the return for the taxable year (or, if no return is filed, 90 percent of the tax for such year)", or (ii) if the individual filed a return for the preceding taxable year, then "100 percent of the tax shown on the return of the individual for the preceding taxable year." Thus, the IRS's burden of production under section 7491(c) requires it to produce, for each year for which the addition is asserted (here, 2015), evidence that the taxpayer had a required annual payment under section 6654(d). Where a taxpayer does not file a return for the year for which the penalty is asserted, the Commissioner must put forth evidence sufficient for the court to determine that the taxpayer had an obligation to file an income tax return for the year for which the penalty is asserted, and either: the amount of tax shown on the prior year's return, or evidence sufficient to conclude that the

**[\*77]** taxpayer did not file a return for the prior year. Sec. 6654(d)(1)(B); see also Wheeler v. Commissioner, 127 T.C. at 211-212.

The Commissioner met this burden here by showing that Ms. Sham had taxable income in 2015 and that she had not filed a return for 2014 or 2015 at the time that the IRS issued the SNOD in February 2017. Consequently, the Commissioner carried his burden of production to show that Ms. Sham is liable for the section 6654 addition; Ms. Sham does not contest these facts or argue any defense. She is therefore liable for this addition for failure to pay estimated tax.

3.    Accuracy-related penalty

Section 6662(a) and (b)(1) and (2) imposes an "accuracy-related penalty" of 20% of the portion of the underpayment of tax that is attributable to the taxpayer's negligence or disregard of rules or regulations or that is attributable to any substantial understatement of income tax. The IRS determined penalties for the first four years at issue--i.e., 2010 through 2013, the years for which Ms. Sham filed returns before the SNOD was issued. Ms. Sham does not raise any issues regarding the Commissioner's compliance with section 6751(b)(1), which requires "approv[al] (in writing) by the immediate supervisor of the individual making such determination" of penalty liability. The Civil Penalty Approval Form, which reflects the signature of the group manager approving both possible alternative

[*78] grounds for the penalties (i.e., substantial understatement and negligence) before the issuance of the SNOD to Ms. Sham is sufficient to show that the IRS complied with the requirement of section 6751(b)(1) for written supervisory approval of the accuracy-related penalties. See Clay v. Commissioner, 152 T.C. 223, 249 (2019).

It appears that even after reducing the tax liabilities to reflect the Commissioner's concessions and our holdings as to additional deductions to which Ms. Sham is entitled, the understatements that we sustain for the years 2010, 2012, and 2013 are "substantial" under section 6662(d)--i.e., they exceed the greater of $5,000 and 10% of the tax that should have been reported on each return. In addition--but most relevant to the return for 2011 (since the 2011 understatement may not be "substantial")--we hold that Ms. Sham was negligent[24] in preparing her returns, since her failure to maintain records to substantiate her deductions was negligent and that the impropriety of many of the deductions is obvious and must have been obvious to her. The Commissioner has carried his burden of production, see sec. 7491(c), to show that petitioner is liable for the penalties. Accordingly, if Ms. Sham's recomputed tax liability for 2010, 2011,

---

[24]Section 6662(c) provides: "For purposes of this section, the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title".

**[\*79]** 2012, or 2013 shows an underpayment of tax required to be shown on the return, but not a substantial understatement (after accounting for net operating losses), we hold that she is liable for the accuracy-related penalty under section 6662(a) and (b)(1) on account of negligence.

However, under section 6664(c)(1), a taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if she can show, first, "that there was a reasonable cause" for the underpayment and, second, that she "acted in good faith with respect to" the underpayment, then no accuracy-related penalty "shall be imposed". Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including her efforts to assess her proper tax liability, her knowledge and experience, and the extent to which she relied on the advice of a tax professional. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs. "Reliance on * * * professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id. Ms. Sham contends that she relied on the advice of professionals--i.e., the accountants who prepared her returns--and that this fact supports a "reasonable cause" defense.

**[*80]** The Court's caselaw sets forth the following three requirements for a taxpayer to show reliance on a tax professional to avoid liability for a section 6662(a) penalty: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Ms. Sham failed to show that she provided necessary and accurate information to the advisers in support of the income she reported and the deductions she claimed. Even if we were to accept her assertion that she provided her accountants with all of the documentary evidence she produced at trial, for each year at issue her proof fell significantly short of substantiating her numerous reported expenses. We find that Ms. Sham has not met her burden to prove reliance on a tax professional to demonstrate reasonable cause and good faith in the preparation of her returns.

**[\*81]** <u>Conclusion</u>

The determinations in the SNOD are sustained in part, to the extent set out

above.  To reflect the foregoing and the parties' concessions,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

[*82]                    APPENDIX A:  INCOME ITEMS

The following tables display, for each of the years 2010 through 2015,
(i) the amount of each item of income that should be shown on Ms. Sham's return;
(ii) the sum of the amounts to which the parties have agreed and the amounts
which have not been disputed; and (iii) any adjustment to the amounts shown on
the return based either on the parties' agreement or (where the amounts in the third
column are not simply the difference in the first two columns) on our findings in
this Memorandum Opinion:

**2010**

| Item | Return | Agreed | Adjustment |
|---|---|---|---|
| Wages, salaries, tips, etc. | $136,154 | $136,154 | -0- |
| Taxable interest | 1,220 | 1,220 | -0- |
| Taxable refunds, credits or offsets of State income tax | 1,257 | 1,257 | -0- |
| Unemployment compensation | 18,440 | 18,440 | -0- |

The foregoing agreed amounts reflect the Commissioner's concession of $45 in
unreported interest determined in the SNOD.

[*83]     **2011**

| Item | Return | Agreed | Adjustment |
|---|---|---|---|
| Schedule C gross receipts | $72,311 | $6,451 | ($65,860) |
| Taxable interest | 694 | 892 | 198 |
| Taxable refunds, credits or offsets of State income tax | 627 | 627 | -0- |
| IRA distributions | 19,004 | 19,004 | -0- |
| Unemployment compensation | 11,746 | 11,746 | -0- |

The foregoing agreed amounts reflect the Commissioner's concession of $3 in unreported State tax refund income determined in the SNOD.

**2012**

| Item | Return | Agreed | Adjustment |
|---|---|---|---|
| Schedule C gross receipts | $86,600 | $162,283 | $75,682 |
| Taxable interest | 102 | 206 | 104 |
| Taxable refunds, credits or offsets of State income tax | 9,176 | 9,176 | -0- |
| Other income | (12,847) | -0- | TBD |

The -$12,847 net operating loss carryover listed above, which petitioner reported as "Other income", will need to be adjusted in accordance with the findings for 2010 and 2011.

[*84]     **2013**

| Item | Return | Agreed | Adjustment |
|------|--------|--------|------------|
| Schedule C gross receipts | $117,300 | $98,790 | ($18,510) |
| Taxable interest | -0- | 11 | 11 |
| Dividends | -0- | 141 | 141 |
| Other income | (21,675) | -0- | TBD |

The −$21,675 net operating loss carryover reported as "Other income" will need

to be adjusted in accordance with the findings for 2010 through 2012.

**2014**

| Item | Return | Agreed | Adjustment |
|------|--------|--------|------------|
| Schedule C gross receipts | $71,451 | $71,451 | -0- |
| Taxable interest | 1 | 11 | $10 |
| Dividends | 54 | 107 | 53 |
| Taxable refunds, credits or offsets of State income tax | -0- | -0- | [1]12,022 |
| Capital gain or (loss) | (3,000) | -0- | 3,000 |
| Other income | (21,675) | -0- | TBD |

[1]This adjustment will be made only if Ms. Sham is not liable for AMT for 2010 when her tax liability for that year is recomputed.

The "Agreed" amount of Schedule C gross receipts of $71,451 represents the

Commissioner's concession of $85,885 of the $157,336 determined in the SNOD.

Ms. Sham reported this amount on her return and did not dispute it at trial (our

[*85] reason for not revising the label "Agreed"). She disputed it after trial, asserting it was only $51,562, but we have resolved the dispute in favor of the Commissioner, resulting in no adjustment to the amount reported on the return. The –$21,675 net operating loss carryover reported as "Other income" will need to be adjusted in accordance with the findings for 2010 through 2013. Further, consistent with our finding that the activity in the TD Ameritrade account in Ms. Sham's name was not in fact attributable to Ms. Sham, the capital loss resulting from the TD Ameritrade account is not allowed on her return.

### 2015

| Item | Return | Agreed | Adjustment |
|---|---|---|---|
| Schedule C gross receipts | $36,000 | $36,000 | -0- |
| Capital gain or (loss) | (3,000) | -0- | -0- |
| Other income | (8,828) | -0- | TBD |

These amounts reflect the Commissioner's concession of $45 in unreported interest determined in the SNOD. The Schedule C gross receipts of $36,000 represent the Commissioner's concession of $36,800 of the $72,800 determined in the SNOD. The –$8,828 net operating loss carryover reported as "Other income" will need to be adjusted in accordance with the findings for 2010 through 2014. Further, consistent with our finding that the activity in the TD Ameritrade account

**[\*86]** in Ms. Sham's name was not in fact attributable to Ms. Sham, the capital loss resulting from the TD Ameritrade Account is not allowed as a deduction on her return (but the capital loss of $35,542 resulting from her own account is allowed).

[*87]                              APPENDIX B:  DEDUCTIONS

The following tables display, for each of the years 2010 through 2015,

(i) the amount of the expenses for which petitioner seeks deductions on

Schedule A[25] or Schedule C of her return for various items at issue (but without

any corresponding computational adjustments); (ii) the amounts to which the

parties have agreed or the Commissioner has conceded petitioner is entitled to

deduct; and (iii) additional amounts that, after trial, we find petitioner paid and for

which she adequately substantiated the requisite business purpose or use:

**2010**

| Expense | Return | Agreed | Additional amount |
| --- | --- | --- | --- |
| Sch A medical[1] | $61,230 | $39,698 | $4,557 |
| Sch A employee business expenses | | | |
| Parking, tolls, transport | 1,220 | -0- | -0- |
| Travel away from home | 3,461 | -0- | -0- |
| Meals and entertainment | 4,221 | -0- | -0- |
| Other | 25,661 | 6,210 | -0- |

---

[25]For each year Schedule A medical expenses are stated, the finding is the amount of Ms. Sham's unreimbursed medical expenses before applying the limitation of section 213(a).

[*88] We hold that Ms. Sham is entitled to the foregoing deductions for 2010. We make no adjustment to the following Schedule A deductions that she claimed and that were not disallowed in the SNOD or otherwise disputed by the Commissioner: $18,548 for State and local taxes and $845 for gifts to charity. To the extent the computation requires Ms. Sham to be liable for AMT, her income items for 2014 will not include the State tax refund of $12,022.

**2011**

| Expense | Return | Agreed | Additional amounts |
|---|---|---|---|
| Sch A medical | [1]$21,272 | $21,272 | -0- |
| Sch C-2 rent/lease | 29,078 | -0- | -0- |
| Sch C-1 rent/lease | 6,922 | -0- | -0- |
| Sch C-1 depreciation | 1,246 | -0- | -0- |
| Sch C-1 travel | 10,083 | -0- | -0- |
| Sch C-1 office | 8,085 | -0- | -0- |
| Sch C-1 car/vehicle | 9,821 | -0- | -0- |
| Sch C-1 other (local transport) | 1,998 | -0- | -0- |
| Sch C-1 other (dues and subscriptions) | 773 | -0- | -0- |
| Sch C-1 other (IT and technology) | 450 | -0- | -0- |
| Sch C-1 other (storage) | [2]1,500 | -0- | -0- |
| Sch C-1 other (telephone and internet) | 3,254 | -0- | -0- |

**[*89]**

| | | | |
|---|---|---|---|
| Sch C-1 other (business research and establishment) | 4,790 | -0- | -0- |

[1]This amount included $14,581 of self-employed health insurance premiums that were not reported on line 29 of the return.

[2]Ms. Sham conceded this issue for all years at trial. She later asserted claims for each of 2012 and 2013 of $239 and for each of 2014 and 2015 of $240, none of which she substantiated.

We hold that Ms. Sham is entitled to the foregoing deductions for 2011. We make no adjustment to the following deductions that she claimed and that were not disallowed in the SNOD or otherwise disputed by the Commissioner: on Schedule A, $293 for State and local taxes, and $2,662 for gifts to charity; on Schedule C, $1,223 for advertising, $375 for contract labor, $1,775 for legal and professional services, $175 for vehicles, machinery, and equipment, $7,270 for repairs and maintenance, $1,871 for supplies, $454 for taxes and licenses, $4,631 for deductible meals and entertainment, and $1,130 for utilities. The net operating loss deduction claimed by Ms. Sham for 2011 must be recomputed.

**2012**

| Expense | Return | Agreed | Additional amounts |
|---|---|---|---|
| Sch A medical | [1]$26,582 | $26,582 | -0- |
| Sch A contributions | [2]2,370 | -0- | -0- |
| Sch C-2 rent/lease | 28,628 | -0- | -0- |

**[*90]**

| | | | |
|---|---|---|---|
| Sch C-1 rent/lease | 7,372 | -0- | -0- |
| Sch C-1 depreciation | 2,164 | -0- | -0- |
| Sch C-1 travel | 12,403 | -0- | -0- |
| Sch C-1 office | 6,130 | -0- | -0- |
| Sch C-1 car/vehicle | 7,372 | -0- | -0- |
| Sch C-1 deductible meals and entertainment | 4,062 | 4,062 | -0- |
| Sch C-1 other (local transport) | 4,647 | -0- | -0- |
| Sch C-1 other (dues and subscriptions) | 744 | -0- | $100 |
| Sch C-1 other (IT and technology) | 742 | -0- | -0- |
| Sch C-1 other (storage) | 1,824 | -0- | -0- |
| Sch C-1 other (telephone and internet) | 3,254 | -0- | -0- |
| Sch C-1 other (professional development) | 6,825 | 5,981 | -0- |

[1]This amount included $22,626 of self-employed health insurance premiums that were not reported on line 29 of the return.

[2]Even though our findings regarding the income items will raise Ms. Sham's contribution base for 2012, we nonetheless find that she is not entitled to the contribution deduction because she did not substantiate it.

We hold that Ms. Sham is entitled to the foregoing deductions for 2012. We make no adjustment to the following Schedule C deductions that she reported and that were not disallowed in the SNOD or otherwise disputed by the Commissioner: $1,730 for advertising; $4,479 for repairs and maintenance; $1,377 for supplies;

[*91] $459 for taxes and licenses; and $1,216 for utilities.  The net operating loss deduction claimed by Ms. Sham for 2012 must be recomputed.

**2013**

| Expense | Return | Agreed | Additional amounts |
| --- | --- | --- | --- |
| Self-employed health insurance[1] | $12,561 | $12,561 | $6,435 |
| Sch A medical | 16,552 | 16,552 | -0- |
| Sch A tax preparation fees | -0- | -0- | 300 |
| Sch A contributions | 3,100 | -0- | -0- |
| Sch C-2 rent/lease | 29,398 | -0- | -0- |
| Sch C-1 rent/lease | 9,002 | -0- | -0- |
| Sch C-1 depreciation | 5,527 | -0- | -0- |
| Sch C-1 travel | 11,517 | -0- | -0- |
| Sch C-1 deductible meals and entertainment | 4,149 | 4,149 | -0- |
| Sch C-1 office | 6,293 | -0- | -0- |
| Sch C-1 car/vehicle | 7,577 | -0- | -0- |
| Sch C-1 other (local transport) | 2,319 | -0- | -0- |
| Sch C-1 other (dues and subscriptions) | 794 | -0- | 102 |
| Sch C-1 other (IT and technology) | 579 | -0- | -0- |
| Sch C-1 other (storage) | 1,823 | -0- | -0- |
| Sch C-1 other (telephone and internet) | 3,279 | -0- | -0- |

**[*92]**

| | | | |
|---|---|---|---|
| Sch C-1 other (professional development) | 7,860 | 2,000 | -0- |

[1]The Commissioner did not disallow in the SNOD Ms. Sham's self-employed health insurance deduction of $12,561, the "agreed" amount. At trial Ms. Sham substantiated $18,996 in payments for self-employed health insurance. The Commissioner argued that the additional amount should be counted toward Ms. Sham's itemized unreimbursed medical expenses (which he did challenge in the SNOD); but because these are distinct items, we find that Ms. Sham entitled to deduct an additional $6,435 for self-employed health insurance.

We hold that Ms. Sham is entitled to the foregoing deductions for 2013. We make no adjustment to the following Schedule C deductions that she reported and that were not disallowed in the SNOD or otherwise disputed by the Commissioner: $1,890 for advertising; $3,466 for repairs and maintenance; $1,220 for supplies; $129 for taxes and licenses; $1,170 for utilities. In accordance with our findings in prior years, the net operating loss carryforward that Ms. Sham carried to 2013 must be recomputed.

**2014**

| Expense | Return | Agreed | Additional amounts |
|---|---|---|---|
| Self-employed health insurance | $8,605 | $8,605 | -0- |
| Sch A medical | 12,017 | 3,300 | -0- |
| Sch A State and local sales tax | 248 | 248 | -0- |
| Sch A tax preparation fees | -0- | -0- | $800 |

[*93]

| | | | |
|---|---|---|---|
| Sch A contributions | 1,072 | -0- | -0- |
| Sch C-1 rent/lease | 20,000 | -0- | -0- |
| Sch C-1 depreciation | 1,202 | -0- | -0- |
| Sch C-1 travel | 1,356 | -0- | -0- |
| Sch C-1 deductible meals and entertainment | 1,255 | 628 | -0- |
| Sch C-1 other (conferences) | 7,701 | 10,743 | -0- |
| Sch C-1 other (continuing education) | 7,823 | -0- | -0- |
| Sch C-1 other (dues and subscriptions) | 1,412 | -0- | 165 |
| Sch C-1 other (outside services) | 800 | -0- | -0- |
| Sch C-1 other (professional development) | 7,524 | 2,000 | -0- |
| Sch C-1 other (promotion) | 717 | -0- | -0- |
| Sch C-1 other (telephone) | 2,848 | -0- | -0- |

In accordance with our findings for prior years, the net operating loss carryforward that Ms. Sham carried to 2014 must be recomputed.

[*94]   **2015**

| Expense | Return | Agreed | Additional amounts |
|---|---|---|---|
| Self-employed health insurance | $8,831 | $8,831 | -0- |
| Sch A medical | -0- | 675 | -0- |
| Sch C-1 legal and professional services | 654 | -0- | -0- |
| Sch C-1 travel | 794 | -0- | -0- |
| Sch C-1 deductible meals and entertainment | 433 | 500 | -0- |
| Sch C-1 other (conferences) | 554 | 554 | -0- |
| Sch C-1 other (continuing education) | 9,647 | -0- | -0- |
| Sch C-1 other (dues and subscriptions) | 1,172 | -0- | -0- |
| Sch C-1 other (professional development) | 6,274 | -0- | -0- |
| Sch C-1 other (gifts) | 297 | -0- | -0- |
| Sch C-1 other (telephone) | 2,201 | -0- | -0- |

In accordance with our findings for prior years, the net operating loss carryforward that Ms. Sham carried to 2015 must be recomputed.